**OFFICE OF UTILITY CONSUMER COUNSELOR, Appellant,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Appellee (Petitioner Below).**

No. 2–283A50.

Court of Appeals of Indiana, Third District.

May 17, 1984.

**500**

Jan E. Helbert, Deputy Consumer Counselor, Indianapolis, for appellant.

Jon D. Noland, Duejean C. Garrett, Plainfield, for appellee.

HOFFMAN, Judge.

The instant dispute centers on the rate-making procedures applied by the Public Service Commission to a rate request tendered by Public Service Company of Indiana (P.S.C.). P.S.C. requested that its recently completed 625 megawatt, coal fired, electric generation facility, known as Gibson Unit No. 5, be included in its rate base. After an extensive hearing on the matter, the Commission allowed P.S.C. to include 50.5% of the Gibson Unit in its rate base.[1] The Office of the Utility Consumer Counselor appeals.

Two issues are presented for review:
(1) whether the evidence is sufficient to support the Commission's judgment;[2] and
(2) whether the Commission erred in finding the excess capacity generated by the Gibson Unit used and useful, thus included in the rate base.

As a base for this appeal the parties entered into a set of stipulations. These stipulations are of paramount importance to the first issue raised by appellant. Stipulation No. 3 agreed to by the parties states: "3. The parties agree that there was sufficient evidence in the record upon which the Commission based its findings of fact set forth in Finding No. 6 of its order of January 20, 1982." Stipulations of fact agreed to by the parties are binding. A party cannot properly challenge facts on

appeal which it has stipulated to below. *Lyons v. State,* (1982) Ind., 431 N.E.2d 78; *Indiana State Bd. of Tax Com'rs v. Stanadyne,* (1982) Ind. App., 435 N.E.2d 278. This being the case appellant has presented no error for review by this Court insofar as the sufficiency of the evidence is concerned.

The actual argument forwarded by appellant is somewhat harder to discern. Stipulation No. 4 entered into by the parties indicates appellant seeks to require the Commission merely to set an abstract standard establishing a maximum level of reserve generating capacity that will be considered used and useful against which at least this request if not all utilities' rate requests may be judged.

"4. The parties also agree that the Commission's decision contains specific findings on all factual determinations material to its ultimate conclusion regarding the used and useful status of Gibson Unit No. 5, *except that Appellant contends that the Commission failed to make a specific finding of the reserve margin necessary to the efficient and reliable provision of utility service.* Appellee disagrees that such finding was not made and also contends such finding was unnecessary." (Emphasis added.)

As will be discussed more thoroughly in the rest of the opinion, this is an act the Commission is not required to perform.

Apparently conceding this point appellant spends the majority of its time, both in brief and oral argument, contending the Commission failed to apply a coherent analytical process in reaching its determination. In order to address this issue it is necessary to establish the standard of review this Court applies to ratemaking cases.

A discussion of this matter could find no better starting point than *L.S. Ayres & Co. et al. v. IPALCO et al.,* (1976) 169 Ind.App.

---

**1.** 49.95% of the Gibson Unit's output was sold to other electric suppliers and was not included in the rate base for that reason.

**2.** While this issue is broadly stated it shall be considered as a challenge to the Commission's

Finding No. 6 as that is the extent of appellant's argument. Any other error in this regard has been waived for failure to present cogent argument. Ind.Rules of Procedure, Appellate Rule 8.3(A).

652, 351 N.E.2d 814. The *Ayres* opinion is perhaps the keystone decision in this area of law and provides a scholarly and thorough discussion of the principles applicable to the case at bar. A succinct statement of this Court's standard of review in ratemaking cases was stated in *Ayres:*

"At the first level of review, the statutory standard requires that the Commission's decision contain specific findings on all the factual determinations material to its ultimate conclusions.

    \*      \*      \*      \*      \*      \*

"The second level of factual review prescribed by IC 1971, 8-1-3-1 (Burns Code Ed.) requires a reviewing court to inquire whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact." (Citations omitted.) 169 Ind.App. at 661–663, 351 N.E.2d at 822. *See also Southern Ry. Co. v. Board of Com'rs, etc.* (1981) Ind.App. 426 N.E.2d 445; *City of Muncie et al. v. PSC et al.,* (1978) 177 Ind.App. 155, 378 N.E.2d 896; *City of Evansville v. So. Ind. Gas,* (1975) 167 Ind.App. 472, 339 N.E.2d 562.

In the case at bar the parties agreed, in Stipulation No. 4, the Commission made all material findings of fact necessary to its determination.[3] Thus, appellant has waived any error in this regard and the Court need not apply the first tier of our standard of review. Likewise in Stipulation No. 3 the parties agreed the evidence was sufficient to support the trial court's finding at issue. Thus, appellant has waived any error in that regard and this Court need not apply the second tier of the review process.

Consequently, this Court need only consider whether the Commission considered some factor which it should not have or failed to consider some factor it should have. *Pub. Ser. Comm. v. City of Indianapolis,* (1956) 235 Ind. 70, 131 N.E.2d 308. Again the *Ayres* opinion, written by Judge Staton, provides an excellent framework for analysis of this issue.

Judge Staton commented on our limited role in reviewing ratemaking decisions of the Commission:

"The appropriate standard of review therefore limits our inquiry to whether, on the facts of this case, the test-year and adjustment method selected by the Commission were reasonably related to the purpose they were intended to serve—the fixing of 'reasonable and just' rates. This standard of review does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision.. Our function of review is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factors and was reasonably related to the discharge of its statutory duty. In other words, we must determine that there has been no clear error in judgment, and that the Commission's action is founded upon a reasonable basis of support in the whole record." (Citations omitted.) 169 Ind.App. 652, at 676, 351 N.E.2d 814, at 830.

Also discussed was the necessity that this Court be provided with clear, concise, and precise findings of fact:

"Moreover, the rate-making function involves innumerable technical determinations which are peculiarly within the Commission's competence and expertise. When the Commission provides the reviewing court with basic findings of fact on all issues material to its decision, its expert reasoning process and subtle policy judgments provide an intelligible framework for the judicial non-expert. Since 'basic findings' afford a rational and informed basis for review, the danger of judicial substitution of judgment on complex evidentiary issues and policy determinations is substantially reduced."

---

**3.** As discussed earlier in this opinion, appellant did contend the Commission was also required to make a finding of an abstract maximum level of reserve capacity, and failed to do so.

(Citations omitted.) 169 Ind.App. 652, at 662, 351 N.E.2d 814, at 822.

From this basis we proceed into the arcane world of utility ratemaking proceedings.

■ The Commission's purpose is to insure that public utilities provide constant, reliable, and efficient service to its customers, the citizens of this state. In meeting this obligation the Commission may allow a utility to include in its rate base only those facilities which are used and useful pursuant to IND.CODE § 8–1–2–6 which states in relevant part:

"Sec. 6. (a) The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section ...."

As can be imagined different people have different definitions in mind when considering whether a given facility is "used and useful" as contemplated by the statute. Therein lies the question in the case at bar.

Appellant argues the Commission should be required to adopt some set procedure or analytical process to be applied in every ratemaking case. This argument inherently implies the Commission has failed to apply an analytical method in this and past ratemaking decisions. This Court has already recognized that ratemaking decisions do not adhere to rigid, set procedures. In *Ayres*, Judge Staton noted:

"The Commission's policy determinations (legal decisions) are made on a case-by-case basis, and, of necessity, are inextricably intertwined with evidentiary conclusions (factual decisions). The subject matter of the regulatory process is too complex to permit the judicial non-expert any clear insight concerning the legal and factual issues which the Commission thought 'material' to its decision. In light of these difficulties inherent in judicial review of rate proceedings, we are compelled to require the Commission to articulate the policy and evidentiary fac-

tors underlying its resolution of all issues which are put in dispute by the parties." 169 Ind.App. 652, at 676, 351 N.E.2d 814, at 830.

■ In short this Court is faced with a dilemma. The Commission is imbued with broad discretion necessary for it to perform its function and arrive at its goals. The procedures implemented are not subject to precise mathematical quantification as further noted in *Ayres:*

"While this brief summary may indicate that determining a utility's revenue requirement is a simple, almost mechanical task, the process actually requires extensive examination of the utility's operations and continuing exercises of informed administrative judgment. Throughout the remainder of this opinion, two crucial facts about the rate-making methodology should be observed. First, the determination of a utility's revenue requirement is primarily an exercise in informed regulatory judgment. Second, if that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years." (Footnote omitted.) 169 Ind. at 660–661, 351 N.E.2d at 821. *See also State ex rel. Indpls. Water Co. v. Boone C.C.,* (1974) 261 Ind. 583, 307 N.E.2d 870.

As has also been noted by this Court on numerous prior occasions, ratemaking is a legislative rather than judicial function. Toward this end the complicated process of ratemaking is more properly left to the experienced and expert opinion present in the Commission. Judge Staton has raised this consideration in concise language: "The statutory scheme reflects the basic legislative policy that these questions of rate-making methodology are best consigned to the Commission's expert judgment. IC 1971, 8–1–2–47 (Burns Code Ed.)." (Citations omitted.) *L.S. Ayres & Co. et al. v. IPALCO et al.,* (1976) 169

Ind.App. 652, at 675–676, 351 N.E.2d 814, at 830. *See also City of Evansville v. So. Ind. Gas, supra,* 167 Ind.App. 472, 339 N.E.2d 562. Thus, the Court finally arrives at a discussion of the facts and factors considered by the Commission in reaching its determination.

In the case at bar the Commission sets forth an intricate set of facts and considerations which it had before it in reaching a determination. The Commission noted the uncertainties of long distance forecasting of demand levels and the necessity of long-range planning due to the long lead times necessary for construction of plants and other physical assets so that the generation and delivery of electric power is uninterrupted. Within this framework the Commission discussed the fact that reserve capacity necessarily increases dramatically when a new facility as large as Gibson Unit No. 5 is brought on-line. This reserve generating capacity then decreases for a number of years as demand increases and other plants are taken out of service. In this regard the Commission stated: "This situation of *temporary* 'excess reserves' however, provides ratepayers with the benefits of economies of scale."

It is important to note that inherent in this discussion is the Commission's consideration of alternative methods of generating facilities. However the Commission determined the alternative was unreasonable because it was not efficient.and in the long term would be a detriment rather than a benefit to the ratepayers. Such a consideration is consistent with the Commission's statutory duty to insure the utility provides *efficient, reliable* service to the ratepayers.

The Commission discussed the large reserve capacity which would exist when Gibson Unit No. 5 was brought on-line. This reserve capacity was estimated to be approximately 47%.[4] This reserve capacity was estimated to drop to 27% by 1986 due to increased demand. In somewhat of a prophetic note the Commission cautioned

that this reserve capacity could fall even lower if the utility's Marble Hill facility did not become operational in 1986 as planned.

Several experts testified before the Commission. It was their collective opinion that a safe reserve capacity would exist in a range of 15–25%. Again, taking into account the necessary dramatic jump in reserves when a new large scale generating facility comes on-line, the demand forecast indicates that P.S.C.'s reserves will steadily fall toward the minimum safe range for reserves. Again the Commission's determination in this area appears reasonable, logical, and calculated to serve the ratepayers as required by statute. In fact the Commission specifically noted that the inclusion of Gibson Unit No. 5 in the rate base provides "stability," a benefit which more than offsets the temporarily high level of reserve capacity.

The Commission discussed the range of demand experienced in the past by the utility. On at least one occasion during the prior year, P.S.C. was forced to purchase electricity from another utility to meet its demand. The advanced age and inefficiency of a number of P.S.C.'s plants was noted by the Commission. In addition the Commission considered that a specific portion of P.S.C.'s generating capacity might be unavailable on any given day due to accidental disruption of service, derates and normal maintenance.

Finally, the Commission determined that P.S.C.'s decision to build and operate the Gibson Unit was a prudent choice. In fact the Commission went on to state that failure to include the unit in P.S.C.'s rate base could have "catastrophic" results for the *ratepayers.* This finding is contra to appellant's argument that the Commission was attempting to prevent P.S.C.'s investors from suffering catastrophic results of failure to include the Gibson Unit in the rate base.

---

**4.** It is unclear from the record whether this figure includes the total output of Gibson Unit No. 5 or merely the 50.5% that P.S.C. was permitted to include in the rate base. If the figure represents the total output, then reserves should be lower in light of the sale of a portion of the generating facilities excluded from the rate base.

In short the Commission did what it was required to do pursuant to the applicable statutes. In reaching a determination the Commission gathered before it a plethora of factual material and sifted through this evidence in a logical and thorough manner in order to reach its reasonable and well-reasoned determination. The parties admitted by way of stipulation that the Commission had before it all of the facts and findings necessary for its determination. It cannot be said the determination made was unreasonable.

Appellant's request that this Court require the Commission to adopt a standard analytical process to be applied to all rate-making cases by necessity implies the Commission failed to apply a logical analytical procedure in reaching its conclusions in the case at bar. The record indicates that this is not the case. In essence appellant is requesting that this Court force the Commission to reach its conclusion by a different approach than the one it used. This request has been made on a prior decision and was denied by this Court and is denied again. *See Capital Imprv. Bd. et al. v. PSC et al.,* (1978) 176 Ind.App. 240, 375 N.E.2d 616.

In conclusion the Commission had sufficient evidence upon which to base its findings. Further, the Commission made all findings necessary and material to its determination. Finally, the approach adopted by the Commission in analyzing the ratemaking request before it was logical, reasonable, and carefully calculated to obtain and protect the goals of the Commission as set out in statute. For these reasons the Commission's determination is affirmed.

Affirmed.

STATON, P.J., and GARRARD, J., concur.