INDIANA–AMERICAN WATER COMPANY, INC., Appellant–Petitioner,

v.

INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR, Town of Schererville, Indiana–American Industrial Group, Appellees–Statutory Party Intervenors.

No. 93A02–0412–EX–1067.

Court of Appeals of Indiana.

March 10, 2006.

Daniel W. McGill, Nicholas K. Kile, P. Jason Stephenson, Barnes & Thornburg LLP, Indianapolis, for Appellant.

Susan L. Macey, Utility Consumer Counselor, Randall C. Helmen, Deputy Consumer Counselor for State Affairs, Daniel M. LeVay, J. David Agnew, Assistant Consumer Counselors, Indianapolis, for Appellee Indiana Office of Utility Consumer Counselor.

L. Parvin Price, Christopher C. Earle, Bose McKinney & Evans LLP, Indianapolis, David Austgen, Austgen & Decker, P.C., Crown Point, for Appellee Town of Schererville.

Bette J. Dodd, Lewis & Kappes, P.C., Indianapolis, for Appellee Indiana–American Industrial.

## OPINION

CRONE, Judge.

### Case Summary

Indiana–American Water Company, Inc. ("IAWC"), appeals the order of the Indiana Utility Regulatory Commission ("the Commission") on its petition to increase rates and charges for water and sewer service. We affirm.

### Issues

IAWC raises seven issues, which we reorder and restate as follows:

I. Whether the Commission properly excluded one high-service pump from rate base;

II. Whether the Commission properly excluded most of the cost of a customer information system from rate base;

III. Whether the Commission properly disallowed the cost of relocating IAWC's customer call center from Indiana to Illinois;

IV. Whether the Commission properly disallowed IAWC's Internal Audit Department expenses;

V. Whether the Commission properly disallowed a certain portion of IAWC's pension expense;

VI. Whether the Commission properly calculated the cost of common equity; and

VII. Whether the Commission properly calculated IAWC's federal income tax expense at the existing rates.

### Facts and Procedural History [1]

IAWC is an Indiana corporation regulated by the Commission that provides water

---

**1.** We thank the parties for their well-organized and well-written briefs, which greatly facilitated our review of the Commission's 127–page order and the twenty-two-volume record.

utility service to approximately 272,000 customers in twenty-one counties. IAWC is a subsidiary of American Water Works Company, Inc. ("American"). In 2003, American was acquired by Thames Water Aqua Holdings GmbH, a subsidiary of RWE AG, an international multi-utility service provider based in Germany. On September 30, 2003, IAWC petitioned the Commission to increase its rates and charges for water and sewer service. On November 6, 2003, IAWC and the Indiana Office of Utility Consumer Counselor ("OUCC") attended a prehearing conference. The Town of Schererville, Indiana–American Industrial Group ("Industrial Group"), and the Town of Merrillville subsequently intervened.[2] An evidentiary hearing was held on various dates between January and April 2004. On November 18, 2004, the Commission issued an order in which it found that IAWC's rate base was approximately $663,400,000 and that IAWC was entitled to a return of 5.38%. The Commission authorized IAWC to increase its rates and charges by approximately 0.4%, "designed to produce total annual operating revenues of $139,945,004 which, after annual operating expenses of $104,275,376, are expected to result in annual net operating income of $35,669,628." Appellant's App. at 134. IAWC now appeals certain portions of the Commission's order. Additional facts will be provided as necessary.

### Discussion and Decision

 Our review of the Commission's order is two-tiered:

we inquire if specific findings exist as to all factual determinations material to the ultimate conclusions, and we inquire if substantial evidence exists within the record as a whole to support the Commission's basic findings of fact. When reviewing the Commission's order, we give great deference to its rate making methodology. In determining whether the evidence supports the Commission's decision, we neither reweigh the evidence nor substitute our judgment for that of the Commission. We set aside the Commission's finding of facts only when a review of the whole record clearly indicates that the agency's decision lacks a reasonably sound basis of evidentiary support.

In addition, we inquire to see if the Commission's order is contrary to law, that is, whether the order is the result of considering or failing to consider some factor or element which improperly influenced the final decision. The Commission must remain within its jurisdiction and conform to all relevant statutes, standards and legal principles.

*Lincoln Utils., Inc. v. Office of Util. Consumer Counselor,* 661 N.E.2d 562, 564 (Ind.Ct.App.1996) (citations omitted), *trans. denied.*

### I. Exclusion of Pump from Rate Base

 "The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investments which will compensate its investors." *City of Evansville v. S. Indiana Gas & Elec. Co.,* 167 Ind.App. 472, 478, 339 N.E.2d 562, 568 (1975). In so doing, the Commission must determine the utility's rate base, which "consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the 'return' is to be earned." *Id.* at 479, 339 N.E.2d

---

at 569. The rate base "is usually defined as that utility property 'used and useful' in rendering the particular utility service." *Id.* (citing Ind.Code § 8–1–2–6).[3] "The Commission's 'used and useful' standard requires: (1) that the utility plant be actually devoted to providing utility service, and (2) that the plant's utilization be reasonably necessary to the provision of utility service." *Id.* at 516, 339 N.E.2d at 589. More specifically, this Court has stated that "[u]nnecessary plant capacity is not used and useful for rate making purposes and should not be included." *L.S. Ayres & Co. v. Indpls. Power & Light Co.*, 169 Ind.App. 652, 683, 351 N.E.2d 814, 834 (1976), *trans. denied.*

■ In previous rate proceedings, the Commission had included in IAWC's rate base five high-service pumps at its Southern Indiana Operations and Treatment Center ("SIOTC"). In this proceeding, the OUCC proposed that one of those pumps be removed from IAWC's rate base as excess capacity. The OUCC presented evidence that pursuant to the Recommended Standards for Waterworks (also known as Ten State Standards), only four "pumps were necessary to meet peak demand with the largest pumping unit out of service." Appellant's App. at 20. On rebuttal, IAWC's Alan J. DeBoy presented evidence that three of the five pumps serve one million-gallon reservoir compartment, and two of the pumps serve another million-gallon reservoir compartment, either of which could be removed from service for maintenance or rehabilitation. DeBoy testified that all five pumps are necessary to ensure that IAWC can meet its peak demand with one of the reservoir compartments out of service. DeBoy acknowledged, however, that the reservoir-isolation technique had "not yet been used but will be needed 'at some point in the future.'" *Id.* at 22.

On this issue, the Commission found as follows:

> The non-contradicted evidence established that [IAWC], with the largest unit out of service, has 15.7 MGD [million gallons per day] more capacity than the required 22 MGD. Since [IAWC's] case to reject the alleged excess capacity is founded on justifying the need to have this reservoir-isolation technique, we thus need to determine whether this feature is used and useful. Mr. DeBoy's testimony on this point is limited to testifying that reservoir maintenance will be needed at some point in the future. We note that this is the first time this specific feature has been brought to our attention and has not been a contested issue in [IAWC's] previous cases. Therefore, we shall make our decision based on the evidence of record that we now have before us. We find that [IAWC] did not provide evidence to support the time frame within which this engineering feature will be used and useful. Further, we find [IAWC's] evidence lacked information that we deem necessary in order to allow this plant[4] in rate base, this information includes but is not limited to:

**3.** *See* Ind.Code § 8–1–2–6(a) ("The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section.").

**4.** IAWC states, "It is not clear whether the Commission's reference to 'plant' means the reservoir, the pumps, or both, but the penalty imposed by the Commission for this lack of evidence was a reduction in the Company's rate base of $753,378, the amount of the OUCC's proposed pump adjustment." Appellant's Br. at 20–21. As such, we think it reasonable to presume that "plant" refers to

- the frequency that the reservoir maintenance occurs,
- the amount of time necessary to carry out the maintenance of the reservoir,
- the time of year when [IAWC] plans to carry out the maintenance of the reservoir,
- whether [IAWC] could implement the reservoir maintenance during non-peak months, and
- whether [IAWC] needs five (5) pumps at the SIOTC if the reservoir's maintenance could be implemented during non-peak months.

We find that [IAWC's] rate base should be reduced by $753,378 for excess capacity at the SIOTC and that the accumulated depreciation should be also reduced by $232,248.

*Id.* at 22–23.

IAWC challenges the Commission's finding of excess capacity, noting that "the

OUCC's challenge was to the number of pumps and not the number of reservoir compartments[,]" i.e., the reservoir's two-compartment design. Appellant's Br. at 20.[5] We must decline IAWC's invitation to separate these clearly interrelated issues. It is undisputed that IAWC's asserted need for the fifth pump's capacity is based on the closing of one of the two reservoir compartments for maintenance or rehabilitation, which IAWC's own witness admitted had not yet been done and would not be done until some unknown future date.[6] Thus, the fifth pump represents unnecessary capacity that is not used and useful for ratemaking purposes.[7] We acknowledge that the Commission's order specifically addresses the use and usefulness of the reservoir's two-compartment design, rather than the fifth pump itself, but in view of their obvious interrelationship, we find this to be a distinction without a substantive difference. The Commission's

---

the fifth pump, not the reservoir compartment it serves.

5. IAWC does not dispute the Commission's finding that even with the largest pump out of service, it has 15.7 MGD over the required 22 MGD capacity, i.e., an excess capacity of over two-thirds. Neither does it contend that this excess capacity was "reasonably needed over a reasonable planning horizon at the time the plant was constructed[,]" let alone at the present time. Appellant's Br. at 19 (citing *Office of Util. Consumer Counselor v. Pub. Serv. Co.*, 463 N.E.2d 499, 504 (Ind.Ct.App. 1984)).

6. Consequently, we reject IAWC's argument that the Commission violated its state and federal procedural due process rights by helpfully identifying evidence regarding reservoir maintenance that IAWC may offer in future cases to establish that the reservoir's two-compartment design (and therefore the fifth pump) is used and useful for ratemaking purposes.

7. For the first time on appeal, IAWC argues that the "two compartment design is used and useful because it is required by IDEM's regu-

lations[,]" which incorporate by reference the Ten State Standards. *Id.* at 24 and n. 4 (citing 327 IAC 8–3–8). IAWC observes that Standard 7.1.2d requires "a minimum of two clearwell compartments" and that the Commission stated in a prior order that the Ten State Standards "routinely require water facilities to be designed so that projected maximum day demands can be satisfied with the largest unit (e.g. well, pump, filter, etc.) out of service." *Indiana–American Water Co.*, No. 40703, 1997 WL 913208, at *8, 1997 Ind. PUC LEXIS at *24. IAWC then asserts, "Applying the Commission's previously announced test for capacity, one compartment (and its associated pumping capacity) would need to be sufficient to supply the historical maximum day of 22 million gallons with the other compartment out of service." Appellant's Br. at 24. Not only has IAWC waived this argument by presenting it for the first time on appeal, *see Breneman v. Slusher*, 768 N.E.2d 451, 463 (Ind.Ct.App.2002), *trans. denied*, but it has also failed to cite a specific standard to support its assertion.

findings are supported by substantial evidence, and therefore we affirm its exclusion of the fifth pump from IAWC's rate base.

## II. Exclusion of Cost of Customer Information System from Rate Base

IAWC sought to include in its rate base the cost of developing and purchasing a computerized customer information system, known as E–CIS, which came online after IAWC moved its customer call center in Richmond, Indiana, to a customer service center ("CSC") in Alton, Illinois. IAWC shares the CSC with other American subsidiaries. We excerpt the Commission's findings relevant to this issue and the next issue, which is closely related:

As mentioned earlier in the rate base section of this Order, we believe there is enough of a relationship between the acquisition of the E–CIS software and the consolidation of customer services in Alton, Illinois to discuss these two issues jointly in this portion of the Order. . . .

[IAWC] requested we approve the return on and of $6,248,821 related to the purchase and development of the E–CIS software. . . . The OUCC recommended that the $6,248,821 associated with the E–CIS software be disallowed and removed from its rate base . . . .

Sufficient evidence was presented to lead us to conclude that [IAWC's] decision to upgrade its EDIS software to Orcom's E–CIS was made prior to the decision to consolidate its customer service functions in Illinois. What is at issue, however, are the costs and the need associated with (1) the decision to abandon the Richmond, Indiana consolidated customer service center and move to an out-of-state, multi-state consolidated service center and (2) the acquisition of an upgraded customer billing/service

database that has expanded significantly in cost. In the initial three-year contract (1996–1999) between American and Orcom, Orcom agreed to develop E–CIS software that would be able to "go live" at eight (8) sites, of which Richmond, Indiana was one; [IAWC] witness Eckart stated that "going live" meant the Orcom Customer Information System was installed and being used in the production of bills. [IAWC's] portion of the cost to design and implement the software was 9% of the total $7.3 million cost.

Whether the OUCC should have known or not, we derive from the cross-examination testimony of [OUCC witness] Ms. Lynn that the [OUCC] was not readily aware that the upgrade to E–CIS was not limited to the initial Orcom contract. According to testimony and rebuttal evidence from [IAWC] witnesses Eckart and Van den Berg, the initial American–Orcom contract for E–CIS serving eight (8) utilities was supplemented by an October/November 2000 contract between American and Accenture (formerly Anders[e]n Consulting). As we understand [IAWC's] testimony, the initial Orcom "piece" of the E–CIS upgrade comprises only about 10% of the total work (and cost) needed to effect the E–CIS upgrade and application in the context of the consolidated customer service center. According to [IAWC], the cost of the second contract to develop and implement the E–CIS for the Alton CSC is $71,416,845. *The only contract in evidence, however, is American's 1996 through 1999 contract with Orcom.*

After entering into the initial American–Orcom contract but prior to American's decision to cause [IAWC] to convert to Alton, a decision was made to include twenty-two (22) utility locations, including [IAWC], to participate in the

Alton CSC and to implement the E–CIS software for all participating utilities. Mr. Van den Berg testified that, dissatisfied with Orcom's customization work, [IAWC] entered the supplemental contract with Accenture for the purpose of developing a single instance of E–CIS for the Alton CSC. The total cost of developing and installing the E–CIS software rose from $7,326,422 to $71,416,845. And, though there are now twenty-two (22) installation locations using E–CIS, instead of eight (8), [IAWC] is expected to pay roughly the same percentage of the allocation: 9% of $71,416,845, instead of 9% of $7,326,422.

Putting aside the cost issue aside momentarily, we find that [IAWC] presented sufficient justification for the need to upgrade to the E–CIS database....

The question still remains, however, as to the amount of costs to allow for the software upgrade. First, we are unable to determine with any specificity the identity of the additional products and/or services that caused the total price to increase from $7,326,422 to $71,416,845. In addition, other than the testimony that [IAWC's] parent allocated the cost based on its percentage of the total customers served, [IAWC] has not satisfactorily explained why it is more expensive for [IAWC] to go live with E–CIS as one (1) of twenty-two (22) companies with which to share the costs, than it would have been as one (1) of only eight (8). [IAWC] witness Van den Berg acknowledges that providing software for twenty-two (22) utilities, many subject to different sets of regulations, would be more costly than providing the service for eight (8) utilities. However, we would expect some economies of scale since [IAWC] is now sharing the cost with almost three (3) times the number of participants originally proposed. Instead, [IAWC] is expected

to pay roughly the same percentage of a much greater expense. Also, we note the recent trend of [IAWC] to speak of attaining economies of scale within the state only to subsidize smaller American utilities by paying shared costs through a suspect allocation method; a method which does not credit economies of scale reached by the individual utilities. Since the evidence is not sufficient *either* to justify [IAWC's] requested expense *or* to reconcile the discrepancy of cost allocation, we find the most reasonable cost to allow [IAWC] is the allocation of $659,378 (9% of $7,326,425) as agreed to in the initial, three-year Orcom contract as the E–CIS was planned to be developed and implemented before the decision to include [IAWC] in the Illinois CSC.

*With respect to the move from the customer service center in Richmond to Alton, Illinois, we believe the OUCC has presented compelling reasons to find that the move was imprudent and not reasonably necessary.* First, the OUCC discovered that [IAWC] had failed to perform any studies regarding the transfer of the Richmond center's services to the Alton CSC before the transition occurred and, by the time [IAWC] secured an expert to testify about general customer services at Richmond, the Richmond center had ceased being [IAWC's] customer call center. Second, the OUCC testified that the cost to [IAWC's] ratepayers for [IAWC] to participate in the consolidated customer service center would be approximately $2.3 million additionally each year. [IAWC] had filed testimony in Cause No. 42029 that suggests that 88.28% of [IAWC's] customers were very satisfied with the detailed information contained on their bills when compared to other utility bills. Third, the [OUCC] also

offered evidence that suggests that the Richmond call associates were very effective in handling its [customers'] needs. Fourth, when [IAWC] surveyed its customers about the overall quality of service received from the call associates located at the Richmond facility, Mr. Eckart testified that 84.49% of [IAWC's] customers were satisfied with the overall quality of service received from the water company's customer call associates located in Richmond. Furthermore, Mr. Eckart testified that an 85% satisfaction rating from these surveys was [IAWC's] goal[,] stating that an 85% rating would mean [IAWC] had achieved "world class" service. Thus, Richmond's Customer Service Center was considered "world class" based on the customer survey results provided as [OUCC's] Exhibit CX–4.

The OUCC also recalled testimony from [IAWC] in Cause No. 42029 that the centralization of Indiana customer services in Richmond resulted in economies of scale. [IAWC] stated in this Cause that, by consolidating service centers for all American companies in Illinois, economies of scale can be captured because [IAWC] can provide all the new services it described at a much lower cost than it would have incurred to provide them by itself. We believe that [IAWC's] rebuttal evidence is not sufficient to allow such a conclusion. We believe that [IAWC] gained its economies of scale when it centralized its customer service functions into one call center in Richmond, Indiana less than ten (10) years ago when [IAWC] estimated a savings of over $650,000 annually as a result of the consolidation. Moreover, the [OUCC] demonstrated that with or without the inclusion of the E–CIS software in its analysis, there would never be a payback to [IAWC] for its partic-ipation in America's Alton CSC initiative.

We conclude that the Richmond center was providing adequate service to [IAWC's] customers who, for the most part, have been satisfied with the level of service provided by the Richmond center. [IAWC's] evidence in this proceeding is insufficient to demonstrate the necessity to move and consolidate Indiana's customer service functions into a national customer service center. We find it appropriate, therefore, to limit this expense to the amount already reflected in [IAWC's] rate base for the Richmond Customer Service Center.

We also share the concern expressed by the OUCC that [IAWC] is asking its customers to subsidize other states' inefficiencies. The OUCC testified that according to the "Business Case Review," American expects to save approximately $6 million each year over the next five (5) years as a result of establishing the Alton Customer Satisfaction Center, but [IAWC] is expected to *pay* $2.3 million each year. As a result, some of [IAWC's] inefficient affiliates will share in the savings, while Indiana customers are expected to pay more. Indiana customers benefited from the efficient customer service center in Richmond and should not now be financially penalized so that a consolidated grouping of efficient and inefficient affiliates can produce a savings for the parent company.

While we accept as a general concept that consolidations and shared services can result in greater benefits and efficiencies, we will review any such request separately and with an eye toward the impact on Indiana ratepayers. Within any such review we expect complete and substantial justification for the anticipated benefits and efficiencies.

Finally, [IAWC] has openly recognized, even prior to this Cause, that the establishment of a consolidated call center could lead to the elimination of jobs in Indiana. Nonetheless, it is disturbing that what we find to be an imprudent decision to establish a consolidated call center, with respect to Indiana customer service needs, is exacerbated by the elimination of forty-seven (47) customer service jobs in Richmond, Indiana.

Appellant's App. at 110–13 (italicized emphases added) (citations to hearing transcript omitted).

■■■ "While the utility may incur any amount of operating expenses it chooses, the Commission is invested with broad discretion to disallow for ratemaking purposes any excessive or imprudent expenditures." *Office of Util. Consumer Counselor v. Indiana Cities Water Corp.*, 440 N.E.2d 14, 15 (Ind.Ct.App.1982), *trans. denied*. In challenging the Commission's disallowance of all but $659,378 of the cost of the E–CIS, IWAC directs our attention to Indiana Code Section 8–1–2–48(a):

The commission shall inquire into the management of the business of all public utilities, and shall keep itself informed as to the manner and method in which the same is conducted and shall have the right to obtain from any public utility all necessary information to enable the commission to perform its duties. *If, in its inquiry into the management of any public utility, the commission finds* that the amount paid for the services of its officers, employees, or any of them, is excessive, or that the number of officers or persons employed by such utility is not justified by the actual needs of the utility, or *that any other item of expense is being incurred by the utility which is either unnecessary or excessive, the commission shall designate such item or items, and such item or items so*

*designated, or such parts thereof as the commission may deem unnecessary or excessive, shall not be taken into consideration in determining and fixing the rates which such utility is permitted to charge for the service which it renders.* (Emphases added.)

■■■ IAWC claims that reversal is required because the Commission did not specifically find the cost of the E–CIS to be unnecessary or excessive. We disagree. Where the Commission's findings are sufficiently specific to enable intelligent review and indicate on their face that the statutory prescribed considerations have been made, we will not remand "for the repetitive and unnecessary task of including the exact statutory language in the findings." *Fred J. Stewart Trucking, Inc. v. Bunn Trucking Co.*, 151 Ind.App. 157, 163, 278 N.E.2d 310, 314 (1972), *trans. denied*. A fair reading of the Commission's detailed findings clearly indicates that it considered the cost of the E–CIS to be unnecessary or excessive, and we will not remand for insertion of that statutory language.

IAWC also accuses the Commission of rewriting or rejecting its agreement with American's Service Company, which provides for the allocation of common costs (such as for the E–CIS) based on a subsidiary's number of customers. IAWC notes that the agreement has been on file with the Commission since 1989, has been applied in several intervening rate cases, "and was the basis for the Orcom contract cost allocation that the Commission did not disallow." Appellant's Br. at 33. We note, however, that the Commission merely questioned the cost allocation methodology with respect to the Accenture contract and did not rely on its skepticism regarding economies of scale as the sole basis for denying the E–CIS costs exceeding those of the Orcom contract; the Commission

also found that IAWC did not present sufficient evidence to justify those costs.[8] In effect, the Commission upheld the terms of the Orcom contract, cost allocation and all. IAWC has failed to establish that the Commission erred in doing so.

### III. Disallowance of Cost of Relocating Customer Call Center

■■■ Next, IAWC challenges the Commission's disallowance of the cost of relocating the Richmond customer call center to the Alton CSC based on its finding that the decision was imprudent and not reasonably necessary. IAWC touts its testimony regarding the CSC's multilingual communication capabilities, extended customer service hours, and improved technological and billing capabilities, while downplaying the Commission's findings regarding customer satisfaction with the Richmond call center and the economies of scale achieved by its relatively recent construction. IAWC states that "[a] utility is not obligated to wait until its customers are dissatisfied before implementing technological improvements. Good management dictates doing so before that happens." Appellant's Br. at 41. Perhaps IAWC's customers would be dissatis-

fied to learn that IAWC's management would never be able to recoup the investment in the CSC, as the Commission found. IAWC's argument is simply a request to reweigh the evidence in its favor, which we may not do.[9]

### IV. Disallowance of Internal Audit Department Expenses

IAWC asserts that the Commission improperly disallowed $56,572 in test year [10] management fee expenses for its affiliate's Internal Audit Department. We excerpt the Commission's findings on this issue:

*OUCC's Position.* Ms. Lynn reduced [IAWC's] management fee expense by $56,572 for the Internal Audit Division of an affiliated company. She based her adjustment on [IAWC's] response to OUCC Data Request No. 3, Question 51, in which [IAWC] stated that the Internal Audit Division had not performed an internal audit for [IAWC] in over three (3) years.

*[IAWC's] Rebuttal.* [IAWC's] witness Wolf testified that [IAWC] and its ratepayers receive benefits from the American Internal Audit department because the department does more than

---

8. We must decline IAWC's request to reweigh the OUCC's evidence as to the project's original cost and Van den Berg's general observations about the reasons for the project's cost increase.

9. IAWC further contends that the Commission's mention of the elimination of forty-seven jobs in Richmond violates the Commerce Clause of the United States Constitution. We disagree. This passing remark at the close of the Commission's discussion of the E-CIS/CSC issue is clearly an editorial comment and not a basis for its ultimate decision.

10. *See L.S. Ayres & Co.,* 169 Ind.App. at 657, 351 N.E.2d at 819 ("The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating

expenses plus a return on investment which will compensate its investors. Accordingly, the initial determination that the Commission must make concerns the future revenue requirement of the utility. This determination is made by the selection of a 'test year'-normally the most recent annual period for which complete financial data are available-and the calculation of revenues, expenses and investment during the test year. The test year concept assumes that the operating results during the test period are sufficiently representative of the time in which new rates will be in effect to provide a reliable testing vehicle for new rates.") (citations and footnote omitted). The test year for purposes of this rate proceeding is the twelve months ended June 30, 2003. Appellant's App. at 15.

direct internal audits. He stated that, in addition to performing periodic internal financial audits, the Internal Audit department assists with the annual independent audit performed by Pricewaterhouse Coopers (thereby reducing audit fees allocated to [IAWC]), performs reviews of Information Technology Services processes and procedures, reviews SCADA system security and administers [IAWC's] Code of Ethics.

***Commission Discussion and Findings.*** We reviewed [the OUCC's] Exhibit 3, Attachment DML–11, which contained the complete question and answer to the discovery question the [OUCC] relied upon as its basis for the adjustment:

Q–51: Please describe any and all internal audits, review[s], cost/benefit analyses, assessments or evaluations ("audits") of any aspect of [IAWC's] operations performed in the last three years. Also, please state who performed the audit, the length of the document and whether the audit is complete.

Response: . . . . [11]Without waiver of its objections, [IAWC] states that it has no internal audits for the referenced period. [IAWC] further states that it prepared comprehensive planning studies during the referenced period. Such studies were prepared under the supervision of Alan J. DeBoy. Copies of the comprehensive planning studies will be made available for inspection at its corporate office.

We note that this data request by the OUCC was not just a request for the internal audits that had been performed. Certainly, Mr. Wolf's rebuttal on this subject claims that the affiliated company's Internal Audit division performed audit tests for [IAWC] and a review of [IAWC's] corporate-wide Information Technology Services processes and procedures.

However, despite being clearly within the scope of the OUCC's request, no reference to, or document of these "internal audits, review, cost/benefit analyses, assessments or evaluations" was provided to the OUCC. Indeed, beyond Mr. Wolf's passing assertion of their existence in his rebuttal testimony, there is no documentation whatsoever of these activities in the record of this case.

We note that under the Commission's procedural rules, discovery is designed to be self-executing, and parties should be able to rely on the completeness of other parties' responses. Furthermore, Indiana courts have addressed the issue of inferences that may be drawn from a party's failure to provide evidence within that party's exclusive control, as follows:

In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it. . . . The rule not only applies when a party actively endeavors to prevent disclosure of facts, but also when the

11. The sentence replaced by the ellipsis states: "[IAWC] objects to the request to the extent it requests documents other than internal audits on the grounds that it is overbroad, vague, ambiguous, unduly burdensome and irrelevant to the subject of the proceeding." Appellant's App. at 226. IAWC states that it "objected to the request because, taken literally, it would require production of every piece of paper that could be characterized as an analysis, review, assessment or evaluation of 'any aspect of [IAWC's] operation' for a three year period." Appellant's Br. at 28. We note that the OUCC specifically requested a *description* of audits and reviews, etc., not the audits themselves.

party "merely fails to provide available evidence." *Porter v. Irvin's Interstate Brick & Block Co., Inc.*, 691 N.E.2d 1363, 1364–65 (Ind.Ct.App.1998)(quoting *Morris v. Buchanan*, 220 Ind. 510, 44 N.E.2d 166, 169 (1942)).

Clearly, [IAWC's] records are within [IAWC's] exclusive control. Furthermore, OUCC witness Lynn appropriately raised questions regarding the purposes for which [IAWC] was billed by its affiliate's Internal Audit division. Therefore, without documentation of these management fees [IAWC] paid to its affiliate's Internal Audit division, we may infer that these fees are [not[12]] properly counted as expenses in the provisioning of utility service. Consequently, we find that [IAWC] should reduce its test year management fees by $56,572 for its [affiliate's] Internal Audit Division.

Appellant's App. at 117–18 (some citations omitted).

■■■ IAWC asserts that the Commission improperly disallowed the management fees as a discovery sanction. We disagree. IAWC offered no documentation to support Wolf's claims regarding the services performed by the Internal Audit Department. Under these circumstances, the Commission was well within its discretion to disregard Wolf's testimony and disallow the challenged expenses. *See Morphew v. Morphew*, 419 N.E.2d 770, 777 (Ind.Ct.App.1981) ("In Indiana, uncontroverted evidence is not necessarily binding on the trier of fact. It may be disbelieved and given no weight."), *superseded by statute on other grounds; Gemmer v. Anthony Wayne Bank*, 181 Ind.App. 379, 386, 391 N.E.2d 1185, 1189 (1979) ("The trier of fact may not arbitrarily disregard evidence, but the evidence as a whole and the circumstances of trial may justify rejection of evidence not directly controverted[.]"), *trans. denied.*

## V. Exclusion of Pension Expense

■■■ IAWC proposed an adjustment to test year pension expense based on its proposed conversion from the Employee Retirement Income Security Act ("ERISA") method to the Financial Accounting Standard Board's Statement of Financial Accounting Standards No. 87 ("FAS87") method of computing annual pension expense. According to the Commission, "[t]he difference between the two (2) methodologies is that FAS87 is essentially a current year estimate of pension costs being accrued for currently employed, eligible employees and existing retirees. The ERISA method fluctuates based upon the value of the investments in the pension trust fund, and is therefore more directly influenced by short-term fluctuations of the financial markets." Appellant's App. at 95.

The Commission entered the following findings on this issue:

*[IAWC's] Position* . . . . .

There are two components to [IAWC's] proposed adjustment to reflect the change from ERISA to FAS87. First, the Company proposes to amortize the deferred pension assets accumulated under the ERISA method over ten (10) years. Second, the adjustment reflects an increase in the pro forma FAS87 expense over the test year ERISA contribution level. The pro for-

---

**12.** We agree with the OUCC's contention that the drafter of the Commission's order "inadvertently omitted the word 'not' from this sentence." OUCC's Br. at 11 (footnote omitted). IAWC's argument to the contrary disregards the Commission's ultimate finding on this issue.

ma FAS87 level was calculated based upon a six (6) year average of [IAWC's] projected FAS87 expense for the years 2003 to 2008. The projection for this period was prepared by Towers Perrin, one of the world's largest global management consulting and actuarial firms. The total adjustment to test year expense, including both the average pro forma level and the amortization of the deferred amount is $1,686,130.

*OUCC's Position.* The OUCC did not oppose [IAWC's] proposed conversion to FAS87, the amortization of the deferred amount or the computation of the pro forma level of FAS87 expense. The OUCC's proposed pension expense adjustment is identical to [IAWC's]. . . . Given that the OUCC included [IAWC's] proposed pension expense adjustment in its schedules, we are left to conclude that the OUCC has no objection to [IAWC's'] request.

*Intervenors' Positions.* Both the Industrial Group and the Town of Schererville opposed [IAWC's] proposed pension expense adjustment. [Industrial Group witness] Mr. Gorman noted that the ERISA pension expense reflects the minimum annual cash contribution [IAWC] normally makes to the pension trust fund. He explained that the FAS87 pension expense is an accrual expense recorded on a company's financial statements. Mr. Gorman disputed [IAWC witness] Mr. Wolf's contention that the FAS87 pension expense is more stable. He noted that [IAWC's] pension expense was a negative amount in the calendar years 2000 and 2001 compared to the $1.8 million positive expense accrual projected for the test year. Mr. Gorman also noted that [IAWC's] test year pension expense was based on a 2002 actuarial study which assumed that the long-term return on the trust fund assets would be 9%. According to Mr.

Gorman, the 2002 projected return understates the actual return on stock investments during 2003. He provided an example that the S & P 500 has increased over 35% from January 2003 to January 2004. Consequently, he concluded that this increase in the value of the trust fund assets will lower [IAWC's] FAS87 pension expense when it is updated in 2004. Therefore, Mr. Gorman opined that the support for [IAWC's] requested pension expense under FAS87 for the test year is already stale and probably overstates what [IAWC's] pension expense will be when the study is updated. Mr. Gorman recommended that the Commission be consistent with its past ratemaking treatment of pension expense by continuing to use the ERISA pension expense method and allow [IAWC] to include $677,000 as pension expense, which was the amount incurred for the test year.

Intervenor Town of Schererville offered the evidence of its witness Sommer who divided the $2.2 million adjustment increase into its three (3) components: losses, change in methodology and retired Northwest Indiana executives. The evidence thereafter offered by witness Sommer was a rejection of all three components. Witness Sommer rejected the recovery of the loss component of the $2.2 million pension adjustment, equaling $471,897 per year. The basis for witness Sommer's rejection of this pension loss recovery can be summarized as an objection to charging [IAWC's] ratepayers who lost their own pension funds; the likelihood that with market changes, [IAWC] will actually over-collect on these losses; and a belief that good regulatory policy is not served by such recovery. Witness Sommer's rejection of the change in methodology component of this $2.2

million increase is a rejection of $1,683,288. Witness Sommer's rejection can be summarized as being based on calculations which are wrong and, thus, not fixed, known and measurable. Finally, witness Sommer rejected the recovery of the third component, equaling $34,236, relating to retired former executives of Northwest Indiana, which is part of [IAWC's] acquisition of Northwest Indiana.

*[IAWC's] Rebuttal.* Mr. Wolf first disputed Mr. Gorman's testimony on the relative volatility of FAS87 and ERISA for purposes of computing annual pension expense. He introduced an exhibit which shows the ERISA level goes from zero for the year 2001 to in excess of $4 million for the year 2005 and then down to $1.3 million for 2008. During the same time period, the FAS87 cost fluctuates from $0.6 million in 2001 to a lower peak of $2.4 million in 2004. The overall average of ERISA from 2003 to 2008 is much higher at $2.6 million per year as compared to the $1.9 million average for FAS87 in those same years.

He also disputed Mr. Gorman's opinions based upon recent market gains. It is the use of FAS87 which is intended to mitigate the effects of short-term fluctuations in capital markets. As a result, he testified that short-term unrealized investment gains or losses will not have a significant impact from one year to the next on the valuation but will have an average impact over longer periods of time.

. . . .

*Commission Discussion and Findings.* We find that [IAWC's] proposed pension expense adjustment should be partially accepted. While Mr. Gorman criticized the move from ERISA to FAS87, the evidence is unrebutted that pension expense will be lower and less

volatile over the ensuing years if this change is made. In addition, no other actuarial valuation was presented which would produce a level of pension expense different from that presented by [IAWC]. Pensions are valuable rights which are offered to employees, many times as a result of collective bargaining.

However, the Commission believes the loss component of the pension adjustment should not be accepted. Both Schere[r]ville's witness Sommer and Industrial [Group] Intervenor's witness Gorman objected to the recovery of this pro forma adjustment. Witness Sommer specifically notes that providing this adjustment to [IAWC's] operating expenses will, in essence, force [IAWC's] ratepayers who lost their own pension investments to cover this loss. We note that [IAWC's] witness Wolf acknowledges that [IAWC] is seeking to recover additional funds from ratepayers who themselves suffered pension losses. Mr. Sommer goes on to point out that there is no good regulatory policy served by allowing recovery of this past loss. Finally, Mr. Sommer points out that the market in which [IAWC's] pension was invested, which caused pension losses historically to occur, has more recently recovered and [IAWC], on a pro forma basis, will potentially be overcompensated if this loss is allowed as part of [IAWC's] revenue request. Accordingly, we find that [IAWC's] proposed pension expense adjustment, less the loss component, should be accepted.

Appellant's App. at 95–97 (citations omitted).

IAWC challenges the Commission's disallowance of the loss component of the pension expense, stating that "[i]f the Commission could reject a legitimate expense for the reason that customers are seeing similar increases in their day-to-day

lives, then there would be no category of expense that could not be similarly rejected." Appellant's Br. at 44.[13] IAWC further contends that absent a finding that its "annual pension expense is unnecessary or excessive, it must be allowed." *Id.* at 44. We agree with Appellees' assessment that IAWC "is attempting to hide behind the complexity of pension expense accounting to shield it from the simplicity of the Commission's conclusion that the past pension loss was not representative of a prospective level of ongoing operating expenses." Town of Schererville's Br. at 19.

This Court has explained that

the determination of a utility's revenue requirement is primarily an exercise in informed regulatory judgment. [I]f that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years.

*City of Evansville,* 167 Ind.App. at 482, 339 N.E.2d at 570–71.[14] Here, the Commission heard evidence that IAWC's estimate for the return on its pension fund assets was low in light of recent market trends and that it would potentially be overcompensated for past losses, notwithstanding any change in its computation method. We may not reweigh the conflicting evidence on this issue in favor of IAWC, and we must once again reject its invitation to remand for insertion of the words "unnecessary or excessive." We affirm the Commission's resolution of this issue.

### VI. Calculation of Cost of Common Equity

By way of introduction, we note that

[i]n determining what constitutes a "fair rate of return," the Commission generally calculates a composite "cost of capital" by adding together the weighted costs of various components of the utility's capital structure, e.g., its long term debt, preferred stock, and common stock. The resulting figure, when expressed as a percentage of the utility's combined debt and equity accounts, is then compared to the utility's existing rate of return. This serves as an initial point of reference in establishing a "fair rate of return" for utility operations.

*Gary–Hobart Water Corp. v. Indiana Util. Regulatory Comm'n,* 591 N.E.2d 649, 653 (citation omitted). "[T]he Commission may consider a myriad of factors when determining a fair rate of return." *Id.*

IAWC challenges the Commission's rejection of its proposed adjustment to the cost of common equity to reflect its size and other company-specific risk char-

---

**13.** We disagree with IAWC's assertion that the Commission did not find "what portion of pension expense was the 'loss component.'" Appellant's Br. at 45. A fair reading of the order indicates that the Commission accepted Sommer's figure of $471,897 per year. To the extent IAWC argues for the first time in its reply brief that the Commission committed reversible error in failing to acknowledge Wolf's testimony disputing the existence of the loss component, this argument is waived. *See Naville v. Naville,* 818 N.E.2d 552, 553 n. 1 (Ind.Ct.App.2004) ("A party may not raise an argument for the first time in its reply brief."); *see also* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief.").

**14.** IAWC cites no authority for its assertion that "[i]n the case of pension expense, the Commission is obligated to follow the same test year and adjustment methods prescribed in its Prehearing Conference Order as it did for the other components of [IAWC's] operating expenses." Appellant's Br. at 44–45.

acteristics. The parties offered conflicting testimony regarding and methods of calculating that cost. We excerpt the relevant findings made by the Commission on this issue:

We are also mindful, as was the OUCC in this Cause, of the assertions made by Thames Water and [IAWC] during our investigation in Cause No. 42250 of the effect that American's recent acquisition by Thames Water, a subsidiary of RWE AG, would have on [IAWC] ratepayers. In our Order in Cause No. 42250, we recalled the testimony of James McGivern, Managing Director–Americas of Thames Water, that [IAWC's] rates would not be increased as a result of the acquisition; that, to the contrary, [IAWC's] access to capital at reasonable rates should be enhanced by its affiliation with Thames Water and RWE AG, thereby providing long-term benefits to ratepayers in what is an extremely capital intensive industry.

In its testimony in this Cause, the OUCC quoted [IAWC's] President, Mr. Eckart, as testifying in Cause No. 42250 that American's acquisition by Thames Water would increase [IAWC's] access to capital markets. Our Order in Cause No. 42250 also recognized Mr. Eckart's assertion that Thames Water and RWE AG have strong credit quality and large financial resources that are devoted to their subsidiary utility businesses in general and water and wastewater utility businesses in particular. Our Order in Cause No. 42250, therefore, recognized Mr. Eckart's assertion that [IAWC's] affiliation with Thames Water and RWE AG would enhance [IAWC's] ability to meet its financial requirements.

The OUCC and Intervenors have put forth a number of reasons to disallow risk premiums in the calculations used to determine a cost of equity in this Cause. In particular, we agree with the testimony of the OUCC that [IAWC] should not be subjected to a downward adjustment because of its subsidiary or otherwise affiliated relationship with American, Thames Water and RWE AG. Likewise, it would not be appropriate to determine [IAWC's] cost of equity by delving into American's, Thames Water's, or RWE AG's financial requirements or resources. But it is a reasonable conclusion that the benefits of being associated with such large and obviously credit-worthy companies should offset the company-specific risk adjustments that [IAWC] has maintained should be applicable in this Cause. The standard financial models that all parties have relied upon to some extent in this Cause, that are useful in determining [IAWC's] cost of equity, are based upon calculation of a number of components, including the inclusion or exclusion of a company-specific risk adjustment. The fact of [IAWC's] relationship with a large international water company is a reasonable factor to consider in analyzing the applicability of the company-specific risk adjustment component. To be blind to the fact of [IAWC's] relationship with a large international water company, when determining the appropriateness of applying a company-specific risk adjustment component to the standard models used to determine a reasonable cost of equity, would be to ignore reality. In addition, it is disconcerting to this Commission that [IAWC] gives no recognition in its models for a rate adjustment in this Cause to the financial benefits that it claimed, in Cause No. 42250, its ratepayers would enjoy as a result of the relationship with a large international water company.

[IAWC] recommended a return of 11.00% on equity capital. However, the

foregoing discussion of the evidence indicates that [IAWC's] recommendation is too high given current levels of capital costs, prevailing economic conditions and because of adjustments made to [IAWC witness] Mr. Boquist's raw results to reflect [IAWC's] increased level of risk relative to that of the proxy group. [IAWC's] unadjusted DCF [discounted cash flow] and CAPM [capital asset pricing model] results were 10.0% and 9.59%, respectively. These were then adjusted upward to reflect the alleged special circumstances of [IAWC] and resulted in values of 11% for the DCF and 11.65% for the CAPM. The [OUCC] recommended a return on equity capital of 8.75% based on DCF results of approximately 8.5% and CAPM results ranging from 7.52% to 9.08% with no special adjustments. [Industrial Group witness] Mr. Gorman recommended a return of 9.75% based on the results of his DCF and CAPM analysis, while [Town of Schererville witness] Mr. Sommer recommended a return of no more than 10%.

Our review of the evidence indicates that [IAWC's] circumstances, as well as economic conditions, have changed significantly since [IAWC's] last rate case. [IAWC's] size has significantly increased; its ability to attract capital has improved as a result of being associated with a large international water company; and the cost of capital is substantially below that which prevailed at the time of [IAWC's] last rate case. Taken together, [IAWC] is no longer more risky than the proxy group companies and is less risky than in the past. Ignoring [IAWC's] adjustments to its cost of equity estimates establishes a range of 9.59% to 10.0%.

Overall, the evidence does not support a cost of equity as low as the [OUCC] recommended. We recognize that capital costs have declined and that the cost of equity should follow suit. However, we have already opined that unadjusted DCF results can understate the cost of equity, and we are mindful of improved economic conditions which will continue to increase the cost of capital over time.

Based on our discussions above, we find [IAWC's] cost of common equity to be 9.25%. This figure is slightly below [IAWC's] unadjusted range of results, but compares favorably to the recommended range of results of both the OUCC and the Intervenors of 8.75% to 10.0%. It affords [IAWC] an opportunity to earn a pre-tax interest coverage ratio that will preserve an "A" bond rating, is high enough to compensate [IAWC] for any marginal risks it faces and anticipates small but continuous increases in the cost of capital in the future.

Appellant's App. at 67–68.

The U.S. Supreme Court has stated that "[a] public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties[.]" *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). In challenging the Commission's cost of equity determination, IAWC asserts that the Commission must consider "the risks of the Indiana utility that it regulates, not its parent company's." Appellant's Br. at 37. IAWC cites *Public Service Commission of Indiana v. Indiana Bell Telephone Company*, 130 N.E.2d 467, 235 Ind. 1 (1955), in which our supreme court faulted the Commission for lowering Indiana Bell's rate of return

based on its required contribution to its parent company's overall return:

Appellee is entitled to a fair return upon its intrastate property actually used and useful for the convenience of the public, without regard to the amount of contribution by way of dividends on its stock, and other reasonable charges which it pays annually to the parent company, A.T. & T.

Appellee is an Indiana corporation, a separate and distinct utility as defined by statute and it is the duty of the Commission to establish for it a schedule of rates which will produce a fair and nonconfiscatory return upon its used and useful intrastate property, whether its stockholders are one or many, and without regard to its relationship to other companies.

The fact that appellee has not used its own credit with which to raise additional capital is immaterial, and its ability to do so cannot be measured by the yardstick of the ability of the parent company to raise additional capital. The intrastate properties and operations of appellee are the ones to be considered in fixing a fair rate of return upon its used and useful property and not those of the entire Bell System.

The acts of appellants in considering the cost of money to the parent company, A.T. & T., and the "entire Bell System" rather than considering only the properties and operations of appellee is in violation of [the property valuation statute, now Indiana Code Section 8–1–2–6], and is unlawful.

*Id.* at 28–29, 130 N.E.2d at 480 (footnote omitted).

IAWC argues that the Commission unlawfully disregarded its company-specific risks, "(which include risks associated with its size, lack of geographic diversity and the limited stock liquidity) because it is a subsidiary of a 'large international water company.'" Appellant's Br. at 38. We find IAWC's reliance on *Indiana Bell* inapposite for two reasons. First and foremost, the Commission did not base its determination of cost of equity on IAWC's parent company's ability to attract capital, which would be forbidden under *Indiana Bell*, but rather on IAWC's ability to attract capital, which is undisputedly enhanced due to its affiliation with a "large international water company." Consequently, IAWC's company-specific risks are lower than they would otherwise be given its size, geographic diversity, and stock liquidity.[15] Second, the Commission based its determination on additional factors, such as the significant increase in IAWC's size and a decrease in the cost of capital since the last rate proceeding. In sum, IAWC has failed to establish that the Commission's decision is contrary to law.

### VII. Calculation of Federal Income Tax Expense

■ Finally, IAWC challenges the Commission's calculation of its federal in-

---

**15.** We therefore decline IAWC's invitation to sift through ten rate case orders involving various utilities, many of which are electric and natural gas utilities, all of which vary in size and financial circumstances, and none of which are in the proxy group considered by the parties' experts in this case. We do not reach the question of whether review of these extra-record orders would be prohibited under *Teledyne Portland Forge v. Ohio Valley Gas Corp.,* 666 N.E.2d 1278 (Ind.Ct.App. 1996), or whether *Teledyne* remains good law.

*Compare id.* at 1282 n. 2 (refusing to consider Commission orders included in parties' appendices: "Our review is limited to matters properly in the record of the proceedings below. Matters included in an appendix are not a part of the record, and we therefore may not consider them."), *with Indiana Bell Tel. Co. v. Indiana Util. Regulatory Comm'n,* 715 N.E.2d 351, 357 (Ind.1999) (citing prior orders in reviewing Commission's interpretation of statute).

come tax expense at the existing rates. IAWC's argument rests primarily on its comparison of the Commission's final order with the OUCC's hearing testimony (as opposed to its proposed final order). IAWC observes that whereas the Commission's net operating income figure at the existing rates is approximately $300,000 higher than the OUCC's income figure, the Commission's federal income tax figure is approximately $500,000 lower than the OUCC's tax figure. IAWC points to this discrepancy and contends that the Commission's tax figure must be "significantly understated." Appellant's Br. at 47. IAWC claims that "the Commission has not made sufficient findings to explain how it arrived at its calculation." *Id.*

We disagree. Simply because the Commission's final calculations differ from those of the OUCC's preliminary calculations does not mean that the Commission must have gotten it wrong. The OUCC notes that IAWC's total federal income tax expense as calculated by the Commission is within $2.00 of the sum of the federal income tax figures for all of IAWC's divisions as calculated by the Commission. OUCC's Br. at 48 (citing Appellant's App. at 121). IAWC does not claim that any of those figures are incorrect or that its total federal income tax expense must be less than the sum of those figures. "We are governed by the presumption that an agency's decision is correct in view of its expertise." *Teledyne Portland Forge v. Ohio Valley Gas Corp.*, 666 N.E.2d 1278, 1283 (Ind.Ct.App.1996). That expertise certainly extends to calculating a utility's federal income tax expense. IAWC has failed to rebut the presumption of correctness, and we will not remand for the Commission to "show its work" in this regard.[16]

16. We note that the Commission did not "show its work" or specify the applicable

We affirm the Commission's order in all respects.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.

federal income tax rate in the two previous IAWC rate cases cited in IAWC's brief.