## MORRIS ET AL. *v.* BUCHANAN ET AL.

[No. 27,731. Filed October 19, 1942. Rehearing denied November 23, 1942.]

O. B. *Thiel* and *Parasco E. Volo,* both of Gary, for appellants.

*Wilson, Crites & Wilson,* of Hammond, for appellees.

RICHMAN, J.—This appeal involves land in Lake County which was mortgaged to secure a series of bonds. The owner conveyed subject to the mortgage. There was no agreement by the grantees John and Franciska Milevsky to pay the mortgage. After an appeal (see *Metelmann* v. *Buchanan* [1935], 101 Ind. App. 150, 198 N. E. 460) a decree was entered in the Porter Superior Court foreclosing the mortgage and establishing the priority of two bonds which matured earlier than the others. The amounts found due, exclusive of costs, were to Fannie Metelmann, $1,468.50, declared to be a first lien, and to appellees herein the total sum of $11,159.60 which includes $734.25 in favor of Fannie Metelmann later assigned to appellees. Personal judgment was entered against the original mortgagors but not against the Milevskys. On an order of sale procured by Fannie Metelmann the sheriff of Lake County sold the property to her for $1,623.54, the amount of her first lien, interest and costs, leaving appellees' judgments wholly unsatisfied.

Within the year after the sale the Milevskys consulted their attorney, Oscar B. Thiel, "about the process of redemption to get their property back" and "after examining the law, and approximately four days later, he advised the Milevskys that if they redeemed the property it could be again exposed for sale; that they had a right to occupy the property until August 12, 1937, and redeem it if they could raise the money; also that they had a right to mortgage the property and that if the property was mortgaged, and the mortgagee re-

deemed from sheriff's sale, that the property could not be sold again." His clients told him "to proceed with the necessary arrangements."

Pursuant thereto the Milevskys executed a note and mortgage on the real estate to appellant Morris for $6,500.00 which mortgage was dated June 21, 1937, and recorded June 30, 1937. Morris delivered a check for $3,500.00 to his attorney P. E. Volo. This check was cashed and the proceeds deposited to the credit of O. B. Thiel and Parasco E. Volo, trustees, in a Gary bank. From this account the following payments were made: $750.00 to Thiel for attorney fees; $400.00 to Galasini as a commission for procuring the money from Morris; $16.25 for intangible tax stamps; $2.00 for recorder's fees; $1.00 for a cashier's check; $5.73 for Volo's traveling expenses; $1,746.04 to the clerk of the Lake Circuit Court in redemption from the sale. This left a balance of $578.98 which was returned to Morris. In all there was advanced $2,921.02 on a note and mortgage purporting to be for $6,500.00. Redemption was made upon the affidavit of Morris as mortgagee and certificate of redemption was issued in his name. All these things except the payment of said balance to Morris occurred during the year for redemption which expired August 12, 1937. In January, 1939, the Milevskys executed a quitclaim deed for the property to appellant Sarantis.

Thereafter appellees filed their complaint in the Lake Superior Court charging that the redemption was fraudulent and while made in the name of Morris was in fact the redemption of the Milevskys and by reason thereof appellees were entitled to resale to satisfy their judgments. The prayer was for vacation of the foreclosure sale and order of resale free from the mortgage to

Morris and other proper relief. Appellants demurred on the ground that the Lake Superior Court was without jurisdiction of the subject-matter because the Porter Superior Court had acquired and retained jurisdiction by virtue of the foreclosure proceedings and decree therein. The demurrers were overruled and answers were filed. There was a trial without a jury, a general finding and decree for appellees vacating the foreclosure sale and declaring the real estate "subject to sale on execution, as if said sale had not been made . . . to pay and satisfy the judgments" of appellees.

While the complaint contains allegations of fraud and is designated by appellees as a suit to remove a fraudulent obstruction to their right of resale, we think essentially it is an action for the determination of rights or interests in real estate, venue of which by § 2-701, Burns' 1933, § 75 Baldwin's 1934, is declared to be in the county where the real estate is situated. Appellants' cases are not in point. There was no interference with the process of a court of concurrent jurisdiction as in *Morgan* v. *Amick, Sheriff* (1936), 102 Ind. App. 603, 4 N. E. (2d) 51; *Hoffmann* v. *State* (1935), 207 Ind. 695, 194 N. E. 331, and cases cited therein. *Habeas corpus* cases like *State ex rel. Kunkel* v. *Circuit Court of Laporte County* (1936), 209 Ind. 682, 200 N. E. 614, involve a collateral attack on the validity of a judgment of a court of coordinate jurisdiction. Here there is no attempt to assail the validity of the foreclosure decree. *Brown* v. *Doak Co.* (1922), 192 Ind. 113, 135 N. E. 343, deals with the subject of pleas in abatement where there are two pending actions asking the same relief. *Hack, Receiver* v. *Bolint* (1935), 101 Ind. App. 133, 191 N. E. 177, holds that where one court has appointed a receiver for a bank another co-ordinate court has no jurisdiction to

appoint a trustee for some of the assets in the custody of such receiver. Here possession of the real estate was not in the court but in the owner by reason of his legal title. The right to resale was not controlled by the decree of the Porter Superior Court but by the statute. If the owner desired to redeem, he could not be prevented by any order of that court. And the effect of his redemption likewise is controlled not by the decree but by the statute. When a foreclosure suit is instituted, the court in which it is pending has jurisdiction of the foreclosure, which is the subject-matter, but that suit does not clothe the court with exclusive jurisdiction of the real estate. We think under § 2-701, *supra,* the action was properly filed in the Lake Superior Court. See *McMannus* v. *Bush* (1874), 48 Ind. 303; *McAfee* v. *Reynolds* (1891), 130 Ind. 33, 28 N. E. 423.

The only other question presented is the sufficiency of the evidence to sustain the finding. The main issue raised by the complaint is whether or not the redemption in the name of Morris, the mortgagee, was in fact the redemption of the Milevskys, the owners of the real estate. Section 2-4003, Burns' 1933, § 626, Baldwin's 1934, provides that if the owner redeems, the sale is vacated "and the real estate is subject to sale on execution, as if such sale had not been made. . . ." Our inquiry therefore is whether there was evidence from which the trial court might reasonably have found the fact of redemption by the owners.

We think there are two theories upon which the finding may be supported. The first is that Milevskys furnished the money for the redemption and the use of Morris' name was but a cloak to hide the source of the money.

From the inception of his employment by the owners

"to get their property back," Mr. Thiel constantly kept his guiding hand on the proceedings initiated by him. He wrote the note and mortgage which were executed June 21, 1937, eight days later helped open the trust account, signed all the checks for payments out of that account, prepared the affidavit of redemption, dated July 16, 1937, and delivered it to the clerk of the Lake Circuit Court, prepared and as notary took the acknowledgment of the Milevskys to their quitclaim deed to Sarantis dated January 3, 1939. He alone appeared for Morris in his ante trial examination, and he tried the case below as attorney for all defendants with Mr. Volo named as co-counsel but apparently taking no part except as witness.

It has already been noted that the mortgage was for $6,500, almost twice the consideration of the alleged loan. This fact is enough to cast suspicion on the bona fides of the transaction. Mr. Thiel's explanation was that there were delinquent taxes of $1,300 or $1,400 which might increase to as much as $1,600, so he thought "the better way would be to make a note for $6,500." Adding $1,600 to $2,921.02 makes $4,521.02, which still is $1,978.98 short of the face of the mortgage. He thought also it might be necessary to foreclose the mortgage, with the expense of a receiver, and further that the Milevskys would want to live in the house a couple of years. The latter was also Mr. Volo's idea as appears from the following:

"The Court: Why was the mortgage made for $6,500?

A. Well, as I said before, we thought we would include the $1,600 in taxes.

The Court: What were the Malevskis to get out of this $6,500 mortgage, were they to have an opportunity to redeem this property from Morris?

A. Well, we allowed them to stay there.

The Court: O, you allowed them to stay there, for how long?

A. Two years.

The Court: And they obligated themselves for $6,500?

A. Yes.

The Court: $3,250.00 rent a year, is that what you thought you were giving to the Malevskis?

A. Since they was collecting the rent.

The Court: How much was the rent they were collecting?

A. I think thirty.

The Court: Thirty dollars a month for two years would be $720.00; and the mortgage was made for $6,500.00 and they got no part of that money in their hands, you said? Now, wasn't the Malevskis to have an opportunity to get this property back, you say you had some expenses?

A. I think we had traveling expenses on and off.

The Court: That is all I want to know."

The record shows that on June 29, 1937, the $3,500 appeared in one sum as a cash deposit to the account of James Morris, kept by him in a Whiting bank, and was checked out to Volo on the same day by check signed "Honey Dell Sandwich Shop by James Morris, Prop."

The examination of Morris was taken before the trial and was introduced in evidence. Repeatedly Mr. Thiel advised or suggested that the witness refuse to answer and particularly when attempt was made to ascertain whence came the cash. The following appears in evidence:

"Mr. Wilson: I believe you said you loaned $3,500.00 on this $6,500.00 note and mortgage, is that right?

A. Yes.

Q. Whose money was it you loaned?

A. I don't think it is necessary to answer that, if I was in business or wasn't in business.

Mr. Thiel: I advise you not to answer."

Again:

"Mr. Wilson: Where did the money come from to redeem the property from foreclosure sale, Mr. Morris?

Mr. Thiel: He can answer that if he knows, or that he doesn't know.

Mr. Wilson: Do you know?

A. I don't know where it came from.

Q. You don't know?

A. That is right."

Neither Morris nor anyone else told where the cash was obtained. Morris was present at the trial and available as a witness. Mrs. Milevsky testified that her husband didn't have that much money June 21, 1937, when the mortgage was executed. Her husband did not testify and her statement is entirely consistent with the fact that he might have had or procured that amount eight days later when the cash was deposited in Morris' bank account. Statements of this account, which was the only one he had, show all transactions from June 15, 1937, to February 24, 1938, and disclose that during all that time he never had a balance in excess of $285.00, that every few days the account was overdrawn, that no deposit other than the $3,500.00 exceeded $275.00 and that the daily deposits were usually much less. He was twenty-eight years old when the cash deposit was made. Until about two years before he had lived with his father John Morris and worked in a shop owned by the father. Appellant Morris had never before loaned money, knew nothing about any of the details in connection with the mortgage, had never had possession of the note or mortgage, had not seen the mortgaged property until the date of the mortgage, did not know that the property had been redeemed, and did not remember whether he signed any papers in connection

with the redemption. It is fair to assume from his examination that with such fragmentary knowledge of what was going on he was acting merely as a "dummy" in the transaction. The testimony of Mr. Volo, his attorney, who attempted some explanation, was so contradictory that the trial judge remarked:

"He has told two different stories about this thing; I don't know which one to believe. In one instance he says he saw the money and in another instance he did not, but the check was delivered to him the day after it was deposited. What am I to believe?"

In view of the purpose of Mr. Thiel's employment, his participation in every phase of the scheme which he devised to avoid the effect of a redemption by his clients, and the persistence with which he blocked the efforts of appellee's counsel to find whence came the $3500 cash, all as disclosed by the evidence to which we have referred, we think the trial court could reasonably have drawn not only the inference that the money was not furnished by Morris but also the inference that it was furnished by the Milevskys who were the avowed beneficiaries of the scheme.

In the case of *Great American Tea Co.* v. *Van Buren* (1941), 218 Ind. 462, 467, 33 N. E. (2d) 580, 581, this court declared:

"Many of the facts about which there is uncertainty were peculiarly within the knowledge of the appellant and such a situation may give rise to an inference that if these had been fully disclosed they would have been unfavorable. While this rule will not be carried to the extent of relieving a party of the burden of proving his case, it may be considered as a circumstance in drawing reasonable inferences from the facts established."

See also *Railway Express Agency, Inc.* v. *Bonnell* (1941), 218 Ind. 607, 33 N. E. (2d) 980; *Indianapolis*

*and Cincinnati Traction Company* v. *Monfort* (1923), 80 Ind. App. 639, 646, 139 N. E. 677, 680, 31 C. J. S. *Evidence* § 156, p. 847. This rule applies where a party merely fails to produce available evidence. Much more should it apply where that party actively endeavors, as was done in this case, to prevent disclosure of the facts. Morris could have testified, if he knew, where he got the cash. If it did not come from the Milevskys, they could have so testified. Galasini, who is supposed to have procured it for a commission of $400, did not testify.

Adding together the financial circumstances of Morris, his indifference to the details of the transaction, his ignorance, actual or assumed, of what transpired, his refusal to disclose explanatory facts which were peculiarly within his knowledge, there is no impediment to the trial court's finding that it was not his money with which the redemption was made. Having so found, the court might also reasonably infer from the Milevskys' employment of an attorney to get back their property by the process of redemption that the money for that purpose was available to them. It is but a short step further to infer that their money actually was used in the redemption. The only other possible inference is that the money belonged to an undisclosed principal other than the Milevskys for whom Morris was acting. But it is inconceivable that with $3500 or even $2921.02 at stake such a principal would not have come forward to establish his claim since, on this theory, all that was necessary successfully to meet appellees' cause of action was proof that the redemption money did not come from the Milevskys. Confronted with the problem of ascertaining which was the more probable of three possible sources of the money, we can well understand from the evidence how both Morris and the

undisclosed principal would be eliminated leaving the owners of the real estate whose attorney manipulated the redemption.

The other theory upon which the decision may be sustained assumes that the cash belonged to Morris and was loaned in good faith. If the $6500 mortgage had a consideration it was the whole $3500, not any one of the items afterwards paid from the fund. Both Morris and his attorney Volo stated that the loan was for $3500. There is nothing in the record to show that at the time it was furnished it was made up of several sums, some of which were turned over to the so-called trustees acting for the Milevskys, the remainder to be held by them as trustees for Morris. The signature card required by the bank when the account was opened shows that it was in the name of "O. B. Thiel and Parasco E. Volo, Trustees," but neither this card nor any other evidence shows for whom they were trustees. The trial court had a right to assume they were trustees for the Milevskys.

When one lends money to another the lender parts with title and takes instead an obligation to repay. If this was a valid loan, the money consideration for the mortgage became the property of the mortgagors. This is true regardless of the fact that it was never in their hands. They did not personally receive the $400 which was used to pay Galasini but it would hardly be contended that the commission charged for procuring a loan was paid by the lender. The money used to redeem from the sale stands on no different basis. It was paid out of the same account in the same manner as all the other payments. While Mr. Thiel testified that he intended, as part of his plan to avoid the effect of the statute, that the money of Morris should be used to redeem, the evidence was such that the trial court might

reasonably have concluded that such intention was not carried out. While Morris could have loaned the Milevskys $750, with which to pay their attorney, or $1000 or any other sum to be used as they desired, he could not lend them the $1746.04 with which the redemption was in fact made without making it the redemption of the owner of the real estate.

From the case of *Hervey* v. *Krost* (1888), 116 Ind. 268, 19 N. E. 125, which was the foundation of the Thiel plan, it appears that the mortgage therein was given to secure a prior indebtedness. It does not appear that the money which the owner became obligated by his mortgage to repay was used in the redemption. Whatever may have been the secret intention of the devisor of the plan, the means used and the understanding of Morris that the Milevskys were bound to repay the $3500 warrant an inference that the redemption money was a part of the consideration of the mortgage.

From the whole record it seems that the trial court adopted the first theory in making his finding but if it may be sustained on any theory consistent with the evidence, this court will not set it aside. So whether the cash which was deposited in Morris' bank account came from the Milevskys or was in fact his money loaned to them in good faith, it was their money when it was used for the redemption and though made in his name the redemption was in fact made by the owners of the real estate. This being true, the statute provides that the prior sale is vacated "and the real estate is subject to sale on execution as if such sale had not been made," and it was so declared by the decree which is therefore affirmed.

NOTE.—Reported in 44 N. E. (2d) 166.