Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT:

**LONNIE D. JOHNSON**
**BELINDA R. JOHNSON-HURTADO**
Clendening Johnson & Bohrer, P.C.
Bloomington, Indiana

ATTORNEY FOR APPELLEES:

**SHAWN P. RYAN**
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| THOMAS H. KRAMER, Member and Manager of Domus Property Investments, LLC, | ) ) ) | |
| Appellant-Plaintiff/Counterdefendant, | ) ) | |
| vs. | ) ) | No. 71A04-1305-PL-261 |
| MARK KRAMER, | ) ) ) | |
| Appellee-Defendant/Counterclaimant/ Third Party Plaintiff, | ) ) ) | |
| and | ) ) | |
| DOMUS PROPERTY INVESTMENTS, LLC, | ) ) ) | |
| Appellee-Third Party Defendant. | ) | |

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Michael G. Gotsch, Judge
The Honorable Larry L. Ambler, Magistrate
Cause No. 71C01-0510-PL-292

**May 30, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

In 1996, brothers Thomas H. Kramer ("Tom") and Mark Kramer ("Mark") formed Domus Property Investments, LLC ("Domus"), for the purpose of purchasing and renting housing in South Bend. The Domus operating agreement ("the Operating Agreement" or "the Agreement") contained a noncompetition clause that prohibited Tom and Mark from engaging in similar activities during their involvement with Domus and for one year thereafter. The Agreement also authorized injunctive relief "together with attorney fees" for violation of the noncompetition clause. Appellant's App. at 274. Domus's assets were sold in July 2005. Later that year, Tom filed a complaint against Mark alleging, among other things, that Mark breached the Agreement's noncompetition clause by purchasing and renting three properties ("The Properties"). Tom also requested attorney fees and prejudgment interest. Mark filed counterclaims against Tom and also filed a third-party complaint against Domus requesting the appointment of a receiver. After a bench trial, the trial court issued an order in which it found that Mark had breached the Agreement's noncompetition clause with respect to one of The Properties and awarded Tom damages for lost rents. The court denied Tom's request for attorney fees, declined to award prejudgment interest on the damages for lost rents, and found against Mark on his counterclaims.

On appeal, Tom contends that the trial court erred in not finding that Mark breached the Agreement's noncompetition clause with respect to all three of The Properties. Tom also contends that he is entitled to damages for lost profits and rents, as well as attorney fees and prejudgment interest. We agree with Tom that Mark breached the Agreement's

2

noncompetition clause with respect to all three of The Properties and therefore Tom is entitled to damages for lost profits and rents in the amount of $333,156. Consequently, we reverse and remand as to these issues. Because Tom did not seek injunctive relief under the Agreement, he is not entitled to attorney fees. And because the determination of Tom's damages for lost profits and rents involved more than a simple calculation, he is not entitled to prejudgment interest. Therefore, we affirm the trial court as to these issues.

## Facts and Procedural History

After a three-day bench trial in October 2012, the trial court issued an order that contains the following relevant findings of fact:[1]

1. On October 3, 2005, Plaintiff Thomas Kramer ("Tom") filed his complaint against Defendant Mark Kramer ("Mark") for [(i)] breach of operating agreement and usurpation of corporate opportunities for purchasing and managing properties outside of Domus Property Investments, LLC ("Domus"), (ii) breach of operating agreement and fiduciary duties with excessive provision of pest control services; (iii) breach of operating agreement by distribution of unauthorized management fees; (iv) breach of operating agreement for excessive repair costs; (v) breach of fiduciary duties for failing to properly document loans from Domus to related entities; (vi) breach of operating agreement by equalizing capital accounts; (vii) unjust enrichment; (viii) theft and conversion; and (ix) request for attorney fees.

2. On or around January 18, 2006, Mark filed his Answer with affirmative defenses and a counterclaim for breach of fiduciary duty, unjust enrichment, tortious interference with business and contractual relations, defamation, constructive trust/accounting, and conversion.

….

---

[1] The court reporter compiled a separate transcript volume for each day of the trial. The volumes are separately paginated in violation of Indiana Appellate Rule 28(A)(2), which states, "The pages of the Transcript shall be numbered consecutively regardless of the number of volumes the Transcript requires." We refer to each transcript by date, e.g., Tr. 10/15/12.

4. Mark also filed a Third Party Complaint against Domus requesting the appointment of a receiver.

….

7. Tom and Mark organized and opened Domus in June 1996.

8. Mark and Tom were 50/50 members of Domus.

9. Domus was a company whose business plan partly consisted of the purchase and rental of housing to university students in the South Bend, Indiana, area.

10. In the course of purchasing and renting the properties, Domus would also prepare and renovate the properties, when necessary, to rent to students.

11. Tom and Mark entered into an Operating Agreement on June 12, 1996 which governed the management and operations of Domus.

12. Portions of the Operating Agreement, relative [sic] to this matter are:

    a. **Purpose.** The purpose of the company is **Purchase, Sale and Rental of Real Estate** and to pursue other business and investment opportunities as the Managers shall determine may be beneficial for the Company.

    b. **Other Activities – Non Competition.** The Managers, an affiliate of any of the Managers and any Member operating under this Operating Agreement, shall not be permitted to engage in similar or like business ventures in another company which is directly in competition with the work performed by [Domus]. The non-competition activities shall include, but not by way of limitation, other business ventures or investments of any kind, independently or with others, ventures engaged in owning, operating or managing businesses or properties similar to those businesses or properties owned or operated by the Company. Further agreed by and between the parties, that any Manager or Member shall be prohibited from engaging in a similar or like activity conducted by [Domus] within a range of One

4

Hundred (100) miles for a period of one (1) year after the termination of any Manager's or Member's interest in [Domus]. Further agreed, that [Domus] shall be entitled to file for injunction [sic] relief, together with attorney fees, for violation of this non-competition agreement.

....

**No Waiver.** Failure or delay of any party in exercising any right or remedy under this Agreement, or any other agreement between the parties, or otherwise, will not operate as a waiver thereof. The express waiver by any party of a breach of any provisions of this Agreement by any other party shall not operate or be construed as a waiver of any subsequent breach by said party. No waiver will be effective unless and until it is in written form and signed by the waiving party.

13. Domus was in operation for eleven (11) years from June 1996 through July 27, 2005, when the remaining assets of Domus were sold to North Hill Street. At that point Domus already ceased its day to day business activities.

14. Upon sale, the proceeds were split equally between Tom and Mark, with each brother receiving in excess of $1,750,000.00. The initial capital investment of each brother was approximately $100,000.00.

15. From June 1996 until July 2005, Mark lived in South Bend while Tom lived in Columbus, Indiana.

16. Domus offices were located [in South Bend].

17. Tom was minimally involved with managerial functions.

18. Mark, because he lived in South Bend where the properties were located, took over the day-to-day functions and operations of Domus and was responsible for the accounting records and engaging services on Domus' behalf.

....

21. Mark was an owner and operator of Termiguard Pest Protection ("Termiguard") from 1984 through 2004. In 1996 Mark became the sole owner of Termiguard.

5

22. Prior to the formation of Domus, Mark formed Kramer Properties, LLC ("Kramer Properties"). Kramer Properties was in the student housing business in South Bend. The total Kramer Properties rental units was thirteen (13).

23. For each property owned by Mark or Kramer Properties, Mark tracked expenses, rental income and vacancy rate on a specific ledger for that property.

24. Mark purchased 226 St. Peter Street in South Bend in 1989 and before the formation of Domus, with the intent to tear down the building and use it for parking for his adjacent building … where he operated Termiguard.

25. At the time of purchase, the 226 St. Peter Street building had six St. Mary's College student tenants and Mark honored the then-existing lease. Mark decided against tearing down the 226 St. Peter Street building because of the cash flow it generated.

26. Mark owned 226 St. Peter Street until February 2, 1996, when his divorce was finalized and his ex-wife received the property.

27. Because of the demand from student tenants for rental units, Mark recognized a market opportunity. Once he was divorced in 1996, he decided to pursue the opportunity.

28. Mark took the idea of purchasing and rehabbing student property rentals to Tom, who was intrigued by it. They discussed the potential profitability and other aspects of the business. The brothers had a good relationship at the time.

….

30. Mark's business plan for Domus in 1996 was to acquire ten percent of the off-campus Notre Dame student housing market.

31. He planned to buy homes, rehabilitate them, and bring them to a higher level than what other landlords were offering in the market.

32. Domus achieved that goal in the South Bend market. Tom also had input for the plan.

….

6

56. Termiguard provided pest control related services for Domus. Termiguard billed Domus monthly for services it provided, but Domus, due to its periodic cash flow difficulties, paid only when it had sufficient funds to do so.

….

63. During its active operation, Domus acquired thirty-six buildings plus six condominiums, all in the South Bend area.

64. Domus spent twenty-five to forty thousand dollars per acquisition on average for renovations, with some homes' renovations exceeding sixty thousand dollars to achieve suitable rehabilitation.

….

75. The purchase and management of three (3) separate panels [sic] of real estate are at the center of controversy and shall hereafter referred [sic] to as "The Properties"; 226 St. Peter Street, 1017 East Washington Street, 919 East Washington Street, all in South Bend, Indiana.

76. Again Domus' operating agreement was effective June 12, 1996 and its assets were sold on July 27, 2005.

77. Mark and his current spouse, Kerri, took title to 226 St. Peter Street on September 8, 2000. The property was previously owned by Mark and his then spouse, Judith and Judith took title to the property through dissolution of marriage proceedings on February 2, 1996, prior to the formation of Domus. Mark re-purchased and Kerri purchased 226 St. Peter Street from Judith while the Domus operating agreement was in full force and effect.

78. Mark testified that Tom gave Mark his oral consent prior to the repurchase closing. Tom alleges he gave no such consent. However, Tom was aware of such re-purchase and sought no injunctive relief per the Domus operating agreement.

79. Mark testified that notice of Tom's "non-consent" to the repurchase of 226 St. Peter Street came in the form of the initial complaint filed herein on October 5, 2005, more than five (5) years after the date of repurchase.

7

80.     Mark advised Tom that he was concerned that his Termiguard offices … would be "landlocked" and the purchase of 226 St. Peter Street would alleviate his concerns.

81.     On May 1, 2002 sole ownership of 226 St. Peter Street was transferred to Kerri.

82.     While the Domus operating agreement was in full force and effect Mark and Kerri purchased 1017 East Washington Street by deed on December 15, 2003 and on the same date the property was deeded to Kerri's name alone.

83.     Kramer Properties entered into a lease agreement on May 11, 2005 to rent 1017 East Washington Street from August 1, 2005 to May 2006 and therefore within one (1) year after Domus sold its assets.  For such period Kramer Properties was to receive $2,100.00 in monthly rent or a total of $21,000.00.

84.     While the Domus operating agreement was in full force and effect, Mark and Kerri purchased 919 East Washington Street on July 2, 2004.

85.     Kramer Properties also entered into a lease agreement in May 2005 to rent 919 East Jefferson [sic] Street from June 2005 to May 2006 at a monthly rental rate of $1,050.00.  A second lease went into effect in June, 2006 at $2,646.00 per month and was in full force and effect at the one (1) year anniversary of the sale of Domus's assets.  Kramer Properties therefore received total rent of $17,898.00 on 919 East Washington Street while the Domus operating agreement was in full force and effect and the one (1) year anniversary of Domus's sale of its assets.

86.     The Domus Operating Agreement "Purpose" section does not limit rentals to students alone and therefore Mark's contention that for a lease to "non-student" [sic] at 919 East Washington Street from June, 2005 to May 2006 is irrelevant.

87.     Mark failed to produce any documentation evidencing the alleged purchase prices, rehabilitation and maintenance expenses for 919 and 1017 East Washington Street and the Court cannot speculate as any [sic] such amounts.

88. Mark therefore should be liable to Tom in the sum of fifty percent (50%) of the rental receipts of $17,898.00, to-wit; $8,949.00 without prejudgment interest.

….

90. Mark, without the approval of Tom, drew a total of $60,227.40 as "management fees" while Tom, presumedly [sic] without the approval of Mark, withdrew $36,132.50 in "management fees". Neither action was taken with the intent of stealing by either party.

91. Mark should therefore be liable to Tom in the sum of $24,094.49. Said amount was ascertainable and the amount rested upon mere computation and [is] therefore subject to an award of prejudgment interest.

….

96. Parties should be responsible for the payment of their respective attorney fees without contribution by the opposing party.

*Id*. at 10-22.

The order also contains the following conclusions:

1. Tom and Mark owed each other fiduciary obligations arising out of their relationships as 50/50 owners of Domus.

2. Mark acted in the overall best interest of his brother and Domus.

3. Pursuant to the terms of the Operating Agreement, Tom and Mark were prohibited from engaging in similar or like business in direct competition with Domus and said prohibition continued for a period of one (1) year after the termination of either or both of Tom's and Mark's interest in Domus.

4. Such interest for both parties terminated upon the sale of Domus on July 27, 2005 and the non-competition prohibition continued until July 26, 2006 although there was nothing to compete with after July 27, 2005.

….

9

9. An award of attorney fees is not appropriate herein.

10. Other than the above, Tom has failed to prove by a preponderance of the evidence that Mark is liable to Tom. Mark has failed to prove by a preponderance of evidence that Tom is liable to Mark.

11. JUDGMENT is entered in favor of Plaintiff, Thomas Kramer and against Defendant, Mark Kramer in the sum of $17,898.00 without prejudgment interest thereon.

12. Further JUDGMENT is entered in favor of Plaintiff, Thomas Kramer and against Defendant, Mark Kramer in the sum of $24,094.49 together with prejudgment interest to be computed as heretofore set forth ….

13. Finally, JUDGMENT is entered in favor of Plaintiff and against Defendant on Defendant's claims.

*Id*. at 22-24. Pursuant to a motion to correct clerical error, the trial court amended the sum in paragraph 11 to read $8,949.00.

Tom now appeals. Additional facts will be provided as necessary.

**Discussion and Decision**

Tom argues that the trial court should have concluded that Mark breached the Operating Agreement as to all three of The Properties and awarded him proper damages for each breach. Tom also argues that he is entitled to attorney fees and prejudgment interest. The record indicates that the parties filed a joint motion for findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52 and submitted proposed findings and conclusions to the trial court. Our standard of review is two-tiered:

> we determine whether the evidence supports the trial court's findings, and we determine whether the findings support the judgment. We will not disturb the trial court's findings or judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly

10

erroneous if it is unsupported by the findings and the conclusions which rely upon those findings.

*Bussing v. Ind. Dep't of Transp.*, 779 N.E.2d 98, 102 (Ind. Ct. App. 2002) (citations omitted), *trans. denied* (2003). A judgment is also "clearly erroneous if it applies the wrong legal standard to properly found facts. In order to determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made." *In re Paternity of B.B.*, 1 N.E.3d 151, 160 (Ind. Ct. App. 2013) (citation omitted).

"[W]e consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. We will neither reweigh evidence nor judge the credibility of witnesses." *Bussing*, 779 N.E.2d at 103 (citation omitted). Tom is appealing from a negative judgment, "and therefore we will reverse the trial court only if the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to a conclusion other than that reached by the trial court." *Id*. To the extent that we are required to construe the Operating Agreement, we note that "[c]onstruction of the terms of a written contract is a pure question of law for the court, reviewed de novo." *Puryear v. Progressive N. Ins. Co.*, 790 N.E.2d 138, 139 (Ind. Ct. App. 2003), *trans. denied*. If a contract is clear and unambiguous, the language must be given its plain meaning. *Id*.

### Section 1 – Breach of Operating Agreement

Tom contends that the "undisputed facts in the record[] show that Mark's purchase and management of The Properties was a breach of the Operating Agreement" and that "[w]hile the trial court issued findings of fact to support all elements required for a breach of

11

the non-compete, it erred in not entering conclusions that the Operating Agreement was breached as to each of The Properties." Appellant's Br. at 13. We agree. The Operating Agreement prohibited any member of Domus from "owning, operating or managing businesses or properties similar to those businesses or properties owned or operated by" Domus while a member of Domus and for a period of one year after the termination of any member's interest in Domus. Appellant's App. at 274. It is undisputed that Mark purchased, rented, and managed all three of The Properties and thus operated a business similar to Domus's either while he was a member of Domus or within one year after the sale of its assets. By doing so, Mark breached the Operating Agreement with respect to all three of The Properties.[2]

The trial court found, and Mark emphasizes on appeal, that Tom sought no injunctive relief pursuant to the Operating Agreement, but the Agreement does not limit Tom to that remedy. Moreover, the Agreement specifically provides that no waiver of any right or remedy thereunder would "be effective unless and until it is in written form and signed by the waiving party." *Id*. at 12. There is no evidence that Tom signed any written waiver.[3] In sum,

---

[2] Mark argues that Tom "provided no evidence that Domus was financially able to exploit the opportunity to purchase 226 St. Peter Street." Appellee's Br. at 7. This argument might be relevant as to damages, but not as to whether Mark breached the Operating Agreement.

[3] We note that the trial court did not specifically find that Tom consented to Mark's repurchase of 226 North St. Peter Street.

the trial court clearly erred in not concluding that Mark breached the Operating Agreement with respect to all three of The Properties, and therefore we reverse on this issue.[4]

## Section 2 – Damages

We now address Tom's arguments regarding damages for Mark's breaches of the Operating Agreement. "[T]he measure of damages in a contract action is limited to those actually suffered as a result of the breach which are reasonably assumed to have been within the contemplation of the parties at the time the contract was formed." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993). "That said, the nonbreaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken." *Sisters of St. Francis Health Servs., Inc. v. EON Props., LLC*, 968 N.E.2d 305, 313 (Ind. Ct. App. 2012). "The computation of damages is a matter within the discretion of the trial court, and mathematical certainty is not required. However, the amount awarded must be supported by evidence in the record, and may not be based on mere conjecture, speculation, or guesswork." *Ponziano Constr. Servs., Inc. v. Quadri Enters., LLC*, 980 N.E.2d 867, 873 (Ind. Ct. App. 2012) (citation omitted). "[L]ess certainty is required to prove amount of loss than is required to prove the fact that profits were in truth lost." *Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind. App. 632, 652, 291 N.E.2d 92, 106 (1972), *clarified on other grounds on reh'g*, 154 Ind. 632, 294 N.E.2d 617, *trans. denied*.

---

[4] In a footnote in his appellate brief, Tom notes that he "also brought a breach of fiduciary duty claim against Mark for his purchase of The Properties as '[u]surping a corporate opportunity is a breach of fiduciary duty'" and states that "[a]rguments as to the trial court's findings in these regard [sic] are parallel to the breach of non-compete arguments." Appellant's Br. at 1 (citation omitted). Because we rule in favor of Tom on his contract claim, and because Tom does not contend that he is entitled to additional damages for his fiduciary duty claim, we do not address it.

13

Tom asserts, and Mark does not dispute, that lost profits are properly recoverable for a breach of a noncompetition clause. *See, e.g.*, *Turbines, Inc. v. Thompson*, 684 N.E.2d 254, 257 (Ind. Ct. App. 1997) ("Absent an enforceable liquidated damages clause, lost profits are a proper measure of damages in actions involving covenants not to compete."). Tom further asserts,

> Although the trial court awarded [him] some rental damages as to 919 East Washington Street, a proper award of damages should have included: (i) lost profits for each of The Properties, (ii) lost rents for each of The Properties pursuant to the leases Mark produced, and (iii) lost rents without produced leases from an adverse inference due to Mark's conduct during discovery for each of The Properties.

Appellant's Br. at 18.

Tom's argument assumes that, but for Mark's breach of the Agreement, Domus would have and could have purchased and rented The Properties. Mark does not dispute Tom's assertion that Domus "was ready, willing, [and] eager … to purchase The Properties." *Id.* at 20. But Mark does challenge Tom's assertion that Domus was "able" to do so, claiming that Domus had "poor cash flow." Appellee's Br. at 9. The record reflects that Domus had cash flow problems early on, but Mark himself admitted that Domus was "fully rented up" and "had good cash flow" by 2000. Tr. 10/17/12 at 73.[5] And all of The Properties were acquired in or after September of that year. Appellant's App. at 288, 301, 322. As such, we agree

---

[5] Mark argues that "because Domus always had 100% occupancy[,] no potential renters were ever diverted from Domus." Appellee's Br. at 4. We agree with Tom that this argument misses the point, in that "[i]t is precisely because Domus always had 100% occupancy that it was in a position, at the time Mark purchased and rented The Properties, to expand and purchase more rental properties to earn more rental income." Appellant's Reply Br. at 9.

with Tom that he is entitled to lost profits and rents from all three of The Properties.  The question then becomes, how much?

### Section 2.1 – Lost Profits

As far as lost profits are concerned, Tom contends, and Mark does not dispute, that Mark purchased The Properties for a total of $260,000 and sold them in April 2008 for $741,000, resulting in a gross profit of $481,000.  The trial court found that Mark failed to submit any documentation about the rehabilitation and maintenance costs for The Properties.  Appellant's App. at 21 (finding 87).[6]  Mark also failed to submit any documentation regarding taxes and insurance costs.  Tom asserts that, therefore, "net profits can be found only by subtracting the purchase price [from] the sales price."  Appellant's Br. at 21.

We agree.  In a breach of contract action, "[a]ny doubts and uncertainties as to proof of the exact measure of damages must be resolved against the defendant."  *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012).  Mark testified that Domus, "on average, … spent anywhere from twenty-five to $40,00.00 on rehabilitations[,]" with a few homes costing more than $50,000 to $60,000.  Tr. 10/17/12 at 38.  But Mark offered no testimony, let alone documentation, regarding the rehabilitation costs for The Properties.  It would be pure speculation to conclude that Domus's rehabilitation costs for its properties were similar to Mark's rehabilitation costs for The Properties, and therefore this uncertainty must be resolved against Mark as the breaching

---

[6] Tom points out that Mark did submit documentation regarding the purchase prices of The Properties, contrary to finding 87.  *See* Appellant's App. at 288, 301, 322.

15

party. Consequently, we agree with Tom that, as a one-half owner of Domus, he is entitled to one-half of the $481,000 profit that Mark realized from the sale of The Properties, or $240,500.[7]

## Section 2.2 – Lost Rents

As for lost rents, we agree with Tom that the trial court should have awarded him "lost rents based on the leases [that] Mark actually produced[.]" Appellant's Br. at 22. To reiterate, the Operating Agreement prohibited Domus members from "engaging in a similar or like activity conducted by [Domus] … for a period of one (1) year after the termination of any Manager's or Member's interest in [Domus]." Appellant's App. at 274. Domus's assets were sold on July 27, 2005, and thus the noncompetition clause was effective until July 27, 2006. Tom notes that Mark produced leases establishing that 226 North St. Peter Street was rented from June 10, 2004, through May 25, 2005, at $1980 per month and from June 10, 2005, through May 25, 2006, at $2100 a month, for a total of $48,960. Mark also produced leases establishing that 919 East Washington Street was rented from June 10, 2005, through May 25, 2006, at $1050 per month and from June 10, 2006, through May 25, 2007, at $2626 a month, for a total of $44,112. And Mark produced leases establishing that 1017 East Washington Street was rented from August 1, 2005, through May 25, 2006, and from June 10, 2006, through May 25, 2007, at $2100 per month, for a total of $46,200.

---

[7] Mark sold The Properties almost three years after Domus sold its assets. Mark does not argue that a different value or valuation date should be used to determine Tom's damages for lost profits.

Tom argues that "all rents and profits would have belonged to Domus, not just those that accrued prior to the expiration of the non-compete" on July 27, 2006. Appellant's Br. at 23 n.15. Tom cites no authority for this proposition. Renting The Properties after the noncompetition clause expired did not violate the clause, and thus Tom is not entitled to damages for rents that accrued after the clause expired. Tom is, however, entitled to one-half of the foregoing rents that accrued before the clause expired, which total $92,012 ($48,960 from 266 North St. Peter Street[8] + $17,852 from 919 East Washington Street[9] + $25,200 from 1017 East Washington Street[10]). Tom is thus entitled to $46,006 in lost rents based on the leases that Mark produced.

Also, Tom accuses Mark of failing to preserve and/or intentionally destroying other leases for The Properties and argues that "adverse inferences should be drawn against him. These inferences should include: that (i) The Properties were rented from the time of purchase to the time of sale, and (ii) the rental amounts were always consistent with the few rental contracts that were provided." *Id*. at 23. Tom catalogs Mark's repeated evasiveness in responding to discovery requests regarding The Properties, which resulted in several orders to compel, a contempt order, and several attorney fee awards. Mark ultimately produced the purchase and sale records as well as two leases for each of The Properties. But at trial, he testified that other documents, including records of various expenses related to rehabbing and

---

[8]  ($1980/month × 12 months = $23,760) + ($2100/month × 12 months = $25,200) = $48,960

[9]  ($1050/month × 12 months = $12,600) + ($2626/month × 2 months = $5252) = $17,852

[10]  ($2100/month × 10 months = $21,000) + ($2100/month × 2 months = $4200) = $25,200

renting The Properties, had been damaged in a sewer backup and thus were "not available." Tr. 10/17/12 at 139.

Tom asserts, "Although an adverse evidentiary inference is an extraordinary remedy, courts have universally held it particularly appropriate in cases where the conduct and circumstances occasioned like those [sic] by Mark in this case." Appellant's Br. at 26. Tom cites *Porter v. Irvin's Interstate Brick & Block Co.*, 691 N.E.2d 1363 (Ind. Ct. App. 1998), in which we stated,

> In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it. *Westervelt v. National Manufacturing Co.*, 33 Ind. App. 18, 69 N.E. 169, 172 (1903). "While this rule will not be carried to the extent of relieving a party of the burden of proving his case, it may be considered as a circumstance in drawing reasonable inferences from the facts established." *Great American Tea Co. v. Van Buren*, 218 Ind. 462, 33 N.E.2d 580, 581 (Ind.1941). The rule not only applies when a party actively endeavors to prevent disclosure of facts, but also when the party "merely fails to produce available evidence." *Morris v. Buchanan*, 220 Ind. 510, 44 N.E.2d 166, 169 (1942). These cases are directed to a party which has suppressed evidence believed to be in its control at the time of the law suit; however, we see no reason why they should not be applied where the party spoliates evidence prior to the commencement of a law suit that the party knew or should have known was imminent.

*Id*. at 1364-65.

Tom argues,

> The documentary evidence shows [that] Mark had an ownership and/or a direct financial interest in each of The Properties since before 2005, well before Tom filed his Complaint. Tom has been irreparably damaged by the destroyed evidence in that he cannot reasonably determine, without relying on Mark's own testimony, when The Properties were rented, for how long they were rented, or for how much they were rented.… Tom, due to Mark's

18

spoliation of the requested evidence, has been put in a position where he cannot determine the amount of his claim for breach of contract.

Therefore, adverse inferences should be made by establishing as fact the rental income The Properties generated from the time they were purchased until the time they were sold. Tom is entitled to a further inference that rental amounts were always consistent with the few rental contracts Mark did provide. Therefore, one-half (1/2) of these lost rents, calculated based on the leases which were produced and imputed from the month of purchase to date of sale, should be awarded ….

Appellant's Br. at 27-28.

Regarding 226 North St. Peter Street, which Mark purchased from his ex-wife Judith in September 2000, Mark's own evidence established that the property was rented beyond the terms of the two leases that he produced. Mark's current wife Kerri testified that Mark "had rented it all along," Tr. 10/16/12 at 166, and Mark did not testify otherwise. As such, we conclude that Tom is entitled to one-half of the lost rents from September 2000 through May 2004 at $1980 per month and from June 2006 through July 2006 (when the noncompetition clause expired) at $2100 per month, for a total of $46,650.[11] As stated above, Tom is not entitled to rents that accrued after the noncompetition clause expired.

As for 919 East Washington Street, which was purchased in July 2004, Mark testified that it was not fully rehabbed until January 2005 and sat vacant until June 2005 because it had been marketed for sale. Tr. 10/17/12 at 57. Tom argues that "Mark's actions have made it so that there is no proof, other than his own testimony, on this issue. Given Mark's conduct, as described [above], an adverse inference is warranted and lost rents as to this

---

[11] ($1980/month × 45 months = $89,100) + ($2100/month × 2 months = $4200) = $93,300 ÷ 2 = $46,650

19

property should be inferred for the periods for which no leases were produced." Appellant's Br. at 29. And as for 1017 East Washington Street, which was purchased in December 2003, Mark testified that it was not rented until August 2005. Tr. 10/17/12 at 54. Tom argues that "an adverse inference is necessary" in this instance because "Mark's repeated failure to honestly respond to discovery throughout the course of this litigation, coupled with his spoliation of evidence, severely belies his credibility on this issue." Appellant's Br. at 28-29.

Although Mark may have been evasive in responding to Tom's discovery requests, there is no indication that he intentionally damaged or destroyed any evidence. The trial court made no finding of spoliation and clearly found Mark's testimony regarding the Washington Street properties to be credible, and it was in an infinitely better position to judge Mark's credibility than we are on appeal. Therefore, we must decline Tom's invitation to draw adverse inferences regarding the Washington Street properties and conclude that he is not entitled to lost rents for allegedly unproduced leases for those properties. In sum, Tom is entitled to $92,656 in lost rents[12] and $240,500 in lost profits, for a total of $333,156.

### Section 3 – Attorney Fees

Next, Tom argues that "Domus' Operating Agreement provides for the recovery of attorney's fees relating to a breach of the non-competition provision" and that the trial court erred in not awarding him any. Appellant's Br. at 30. We disagree. The Agreement states that "[Domus] shall be entitled to file for injunction [sic] relief, together with attorney fees, for violation of this non-competition agreement." Appellant's App. at 274. The use of the

---

[12] $46,006 + $46,650 = $92,656

phrase "together with" demonstrates the parties' intent that the recovery of attorney fees be a package deal with injunctive relief, which Tom did not seek. Therefore, we affirm the trial court on this issue.

## Section 4 – Prejudgment Interest

Finally, Tom contends that the trial court erred in not awarding him prejudgment interest. "An award of pre-judgment interest in a breach of contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable," and such an award "is generally not considered a matter of discretion." *Olcott Int'l & Co. v. Micro Data Base Systs., Inc.*, 793 N.E.2d 1063, 1078 (Ind. Ct. App. 2003), *trans. denied*. As indicated above, the determination of Tom's damages from lost profits and rents involved more than a simple calculation, and therefore we affirm the trial court.

## Conclusion

We reverse and remand to the trial court with instructions to find Mark in breach of the Operating Agreement's noncompetition clause as to all three of The Properties and to award Tom $333,156 in damages therefor. We affirm the trial court in all other respects.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and NAJAM, J., concur.

21